Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Jennifer Abreu, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                               Plaintiffs,

            -against-

JOHN STROBECK, M.D., INTEGRATED DIAGNOSTIC
IMAGING & CARDIOLOGY OF STATEN ISLAND, P.C.,
HEART LUNG ASSOCIATES MEDICAL, P.C., JS
MARBLE, P.C., and JOHN DOE DEFENDANTS "1"
through "10,"

                             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

       Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants John Strobeck, M.D. ("Strobeck"),

Integrated Diagnostic Imaging & Cardiology of Staten Island, P.C. ("Integrated"), Heart Lung

Associates Medical, P.C.("HLAM"), JS Marble, P.C. ("JS") (collectively, the "Strobeck PCs"), and

John Doe Defendants "1" through "10" (the "John Doe Defendants")(collectively with Strobeck and Strobeck PCs, referred to hereinafter as the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $1,138,400.00 in damages that GEICO has sustained as a result of the Defendants' scheme involving the submission of thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services for extracorporeal shockwave therapy ("ESWT" or "Fraudulent Services"). The Fraudulent Services allegedly were provided to New York automobile accident victims who were insured by GEICO ("Insureds").

2.      In addition to recovering the money wrongfully obtained, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of approximately $1,214,900.00 in pending no-fault insurance claims for the Fraudulent Services because:

(i)      the Fraudulent Services were allegedly provided by and billed through the Strobeck PCs, which are medical "practices" not under the control and direction of Strobeck, but rather, were at all relevant times operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

(ii)     the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements established between the Defendants and the Clinics (as defined below);

(iii)    the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv)     the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided to Insureds; and

2

      (v)    the Fraudulent Services, to the extent provided at all, were not provided by Strobeck or any other licensed physician, but by persons who were unlicensed, and were neither directly supervised by Strobeck or employed by him or the Strobeck PCs.

3.      Defendant Strobeck is a New York physician who (i) purports to own several medical "practices" – Integrated, HLAM, and JS Marble, and (ii) purports to have used those medical "practices" for short periods, one after another, to allegedly render the Fraudulent Services to more than six hundred fifty (650) GEICO Insureds in a period of just over ten (10) months.

4.      In fact, the Defendants engaged in a massive fraudulent insurance scheme against GEICO and the New York automobile insurance industry in which they billed GEICO alone approximately $2,421,800.00 for the alleged performance of the Fraudulent Services at twenty-five (25) separate locations between July 26, 2021 and May 25, 2022. Notably, thousands of separate bill submissions were made to GEICO seeking payment of no-fault insurance benefits for the Fraudulent Services, all of which represented that Strobeck was the legitimate owner of the Strobeck PCs and that he allegedly performed all the Fraudulent Services. In truth, Strobeck performed none of the Fraudulent Services and did not legitimately operate, manage or control the Strobeck PCs. Further, the Strobeck PCs maintained no stand-alone offices of their own, had no patients of their own, and provided no legitimate or medically necessary services. Indeed, one of the purported professional medical entities, Integrated, was not even actively licensed by the New York State Department of Education at the time it was used to render the Fraudulent Services.

5.      The Defendants engineered this fraudulent scheme on the heels of material changes adopted by the New York Department of Financial Services ("DFS") regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New York's no-fault reimbursement. Those changes eliminated billing abuses and fraudulent treatment practices that

had plagued the automobile insurance industry for more than a decade by, among other things: (i) making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement; and (ii) controlling reimbursement among providers who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

6.      Because the DFS changes in the application of the Fee Schedule hindered Defendants from engaging in the same kinds of no-fault insurance fraud schemes used in the past, Defendants began systemically abusing the performance of ESWT.  Prior to the change in the Fee Schedule, ESWT was considered experimental and was virtually never performed on automobile accident patients or billed to automobile insurers, in part because (i) there was no legitimate peer reviewed data that established the effectiveness of extracorporeal shockwave for the treatment of back, neck, or shoulder pain and (ii) if properly performed, the service required direct involvement by a physician and the use of physical equipment that is very costly and not typically portable. The Defendants, however, concocted a fraudulent treatment and billing scheme pursuant to which:

(i)      unlicensed "technicians" would allegedly render the Fraudulent Services on an itinerant basis at multidisciplinary "clinics" located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (the "Clinics");

(ii)     the unlicensed "technicians" would then generate falsified reports to create a false justification for the performance of the medically unnecessary and illusory Fraudulent Services; and

(iii)    the reports, documents, and bills for thousands of dollars per patient per date of treatment would be sent to New York automobile insurance companies, including GEICO, seeking payment for the performance of the Fraudulent Services.

7.    The success of the fraudulent scheme required coordination between the Strobeck PCs and the John Doe Defendants.   In furtherance of the fraudulent scheme, they took the following actions:

(i)    Strobeck allowed the John Doe Defendants to use his name, medical license, and the Strobeck PCs to bill GEICO and other New York automobile insurance companies for the alleged performance of the Fraudulent Services;

(ii)    the John Doe Defendants: (i) established relationships with laypersons that are associated with the Clinics; (ii) collected the no-fault claims (i.e. the paperwork) from the Clinics for services that are allegedly provided to individuals covered by no-fault insurance; and (iii) referred the no-fault billing and collection work to New York collection lawyers; and

(iii)    the John Doe Defendants established illegal referral and kickback arrangements with the owners and/or managers of the Clinics to allow the Defendants to access a steady stream of patients to be able to fraudulently bill GEICO and other automobile insurers, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

8.    As discussed herein, the Defendants at all relevant times have known that: (i) Strobeck was not in control of the Strobeck PCs- instead, they were operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large scale insurance fraud scheme; (ii) the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; and (iv) the Fraudulent Services, to the extent provided at all, were never provided by Strobeck or any other licensed physician but by persons who were never supervised by Strobeck or employed by the Strobeck PCs.

9.      The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that the Defendants submitted, or caused to be submitted, to GEICO through the Strobeck PCs.

10.     Defendants do not now have – and never had – any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed to GEICO.

11.     Defendants' fraudulent scheme began in 2021 and has continued uninterrupted through the present day as Defendants continue to seek collection on pending charges for the Fraudulent Services. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1,138,400.00.

## THE PARTIES

### I.      Plaintiffs

12.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

13.     Defendant Strobeck resides in and is a citizen of New Jersey. Strobeck is a physician licensed to practice medicine in New York and agreed to allow for the formation of the Strobeck PCs and to "front" as the Strobeck PCs' owner while allowing the John Doe Defendants to use his license and the Strobeck PCs as a billing "vehicle" as part of the fraudulent scheme committed against GEICO and other New York automobile insurers.

14.     Integrated is a New York professional corporation with its principal place of business in New York.

15.     Integrated was incorporated in New York on April 15, 2005 and actually lists its registered agent as the Law Offices of Gabriel & Moroff, P.C., 2 Lincoln Avenue, Suite 302, Rockville Center New York, which is a no-fault billing and collection law firm.  All billing submitted by Integrated to GEICO was by the Law Offices of Gabriel & Moroff, P.C.

16.     Integrated was licensed as a professional service corporation with the New York State Office of Professions from April 15, 2005 through and including March 31, 2020 but is not currently licensed and was not licensed at the time it purported to provide the Fraudulent Services in 2021.

17.     HLAM is a New York professional corporation, with its principal place of business in New York.

18.     HLAM was incorporated in New York on September 1, 2021.  Like Integrated, all billing submitted by HLAM to GEICO was submitted by the Law Offices of Gabriel & Moroff.

19.     JS is a New York professional corporation with its principal place of business in New York.

20.     JS was incorporated in New York on March 15, 2022.  Like Integrated and HLAM, all billing submitted by JS  to GEICO was submitted by the Law Offices of Gabriel & Moroff, P.C.

21.     John Doe Defendants are citizens of New York. John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with Strobeck and the Strobeck PCs by: (i) unlawfully operating, managing, and controlling the Strobeck PCs; (ii) establishing relationships with the laypersons associated with the Clinics; (iii) collecting the no-fault claims (i.e., the paperwork) from the Clinics for the Fraudulent Services; (iv) arranging for and providing the

funding associated with the Fraudulent Services; and (v) referring the no-fault billing and collection work associated with the Fraudulent Services to New York collection lawyers.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

23.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

24.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

25.     GEICO underwrites automobile insurance in New York.

**I.     An Overview of Pertinent Law Governing No-Fault Reimbursement**

26.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§

65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

27.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

28.    An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

29.    Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

30.    Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

31.    The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ….  (Emphasis added).

32.    In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

33.     Unlicensed non-physicians may <u>not</u>: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

34.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals. <u>See, e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

35.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. <u>See, e.g.</u>, New York Education Law § 6512, § 6530(11), and (19).

36.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments or allows unlicensed laypersons to share in the fees for the professional services.

37.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co</u>., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

38.     Pursuant to the No-Fault Laws, only health care providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or

his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

39.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

40.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

41.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code was performed on the patient; (ii) the service described by the specific CPT code was performed in a competent manner and in accordance with applicable laws and regulations; (iii) the service described by the specific CPT code was reasonable and medically necessary; and (iv) the service and the attendant fee were not excessive.

42.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information

11

concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    **Defendants' Fraudulent Scheme**

43.    Beginning in July 2021, Defendants masterminded and implemented a complex fraudulent scheme to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, experimental, and otherwise non-reimbursable services ( i.e., the "Fraudulent Services.")

44.    The Fraudulent Services billed under the names of the Strobeck PCs were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

45.     As discussed in more detail below, ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain, the Centers for Medicare & Medicaid Services ("CMS") has published coverage guidance stating that ESWT is not reasonable and necessary for the treatment of musculoskeletal conditions, and there is no legitimate peer reviewed data that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

### A.    **Strobeck and His Recruitment**

46.    Strobeck is a 75-year-old physician who became licensed to practice medicine in New York in 1977.  Strobeck is also licensed to practice medicine in New Jersey and in Massachusetts.

47.    In 2021, Strobeck was recruited by the John Doe Defendants to participate in the complex insurance fraudulent scheme to bill GEICO and other New York automobile insurers

millions of dollars for medically unnecessary, experimental, and otherwise reimbursable services. Based on the arrangement, Strobeck would receive a periodic payment in exchange for allowing his name, license, and the tax identification numbers of the Strobeck PCs to be used and to contend that he provided and/or supervised the Fraudulent Services if any insurance company ever inquired.

48.     Integrated was incorporated in New York in 2005, and its registration with the New York State Education Department expired on March 31, 2020.  Nevertheless, Integrated began providing and billing GEICO for the Fraudulent Services in July of 2021, which was more than a year after its registration as a professional entity with New York State had lapsed.

49.     Integrated allegedly provided the Fraudulent Services for only three months from July of 2021 to September 24, 2021.

50.     A few weeks before Integrated ceased providing the Fraudulent Services, Strobeck incorporated HLAM on September 1, 2021. HLAM began allegedly providing the Fraudulent Services three days after Integrated ceased, on September 27, 2021. HLAM continued to bill GEICO for the Fraudulent Services until March 24, 2022.

51.     Roughly nine days before HLAM ceased allegedly providing the Fraudulent Services, Strobeck incorporated JS, which then began allegedly providing the Fraudulent Services until May 25, 2022.

52.     Each and every bill from the Strobeck PCs relating to the Fraudulent Services listed the name of either Integrated, HLAM, or JS "C/O Law Offices of Gabriel & Moroff, P.C., 21 Lincoln Avenue, Suite 302, Rockville Center New York 11570."

53.     All bills and related treatment records from the Strobeck PCs for the Fraudulent Services were mailed to GEICO from the Rockville Centre, New York by the Law Offices of

Gabriel & Moroff, P.C., which further directed that all payments be made payable to the healthcare provider in care of ("c/o") that law firm and mailed to them in Rockville Center New York.

**B.    Gaining Access to Insureds**

54.    The Strobeck PCs have never had any legitimate indicia. None of the Strobeck PCs had fixed treatment locations of any kind, did not maintain stand-alone practices, were not the owners or leaseholders in any of the real property from which they purported to provide the Fraudulent Services, did not employ their own support staff, and did not advertise or market their services to the general public, *e.g.*, they did not have a website or internet presence.

55.    The John Doe Defendants controlled the fraudulent scheme by using Strobeck's name and the name of the Strobeck PCs on an itinerant basis in connection with the performance of the Fraudulent Services from more than twenty-five (25) separate Clinics, primarily located in Nassau and Suffolk counties, as well as the Bronx, where they were given access to steady volumes of patients pursuant to unlawful referral arrangements, including the following:

| Clinic - Street Address | Borough/County | Strobeck PC |
|---|---|---|
| 1799 Brentwood Road | Nassau | Integrated, HLAM |
| 21 Washington Ave | Nassau | Integrated, HLAM |
| 2799 S. Route 112 | Suffolk | Integrated, HLAM |
| 1800 A New York Ave | Suffolk | Integrated |
| 900 Route 109 | Suffolk | Integrated, HLAM |
| 1065 Old Country Road | Nassau | Integrated |
| 139 N. Central Ave | Nassau | Integrated, HLAM |
| 179 Great East Neck Road | Suffolk | Integrated |
| 535 Broad Hallow Road | Suffolk | Integrated |
| 1888 Westchester Ave | Bronx | Integrated, HLAM |
| 1308 Grand Ave | Nassau | Integrated, HLAM |
| 1050 Old Nichols Road | Suffolk | Integrated |
| 2426 Eastchester Road | Bronx | Integrated, JS Marble |
| 1647 Macombs Road | Bronx | Integrated |
| 513 Church Ave | Brooklyn | HLAM |
| 3703 92nd Street | Queens | HLAM |
| 164-06 Northern Blvd | Queens | HLAM, JS Marble |

| 2098 Rockway Pkwy | Brooklyn | HLAM |
| 4226 A 3rd Ave | Bronx | HLAM |
| 2598 3rd Ave | Bronx | HLAM |
| 3060 E Tremont Road | Bronx | JS Marble |
| 3407 White Plains Road | Bronx | JS Marble |
| 30 S Ocean Ave | Nassau | JS Marble |
| 1026 Little Neck E Road | Suffolk | JS Marble |
| 695 Dutchess Turnpike | Dutchess | JS Marble |

56.    To obtain access to the Clinics' patient base (*i.e.*, the Insureds), the Defendants entered into illegal financial and kickback arrangements with the unlicensed persons who controlled the Clinics, who provided access to the patients that were treated, or who purported to be treated, at the Clinics. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

57.    The Clinics provided facilities for the Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

58.    In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

59.    For example, GEICO has received billing for purported healthcare services rendered at Clinics located at (i) 2098 Rockaway Pkwy, Brooklyn, which had a revolving door of more than

15

fifty-seven (57) purportedly different healthcare providers; (ii) 21 Washington Avenue, Brentwood, New York, which had a revolving door of more than thirty-four (34) purportedly different healthcare providers; and (ii) 1799 Brentwood Road, Brentwood, New York, which had a revolving door of more than twenty-six (26) purportedly different healthcare providers.

60.    At each of the Clinics, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base. The Clinics willingly provided patient access to the Defendants in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to a high volume of Insureds at the locations.

61.    In keeping with the fact that the Clinics provided access to patients in exchange for kickbacks and other financial incentives, two of the Clinics where the Defendants purportedly provided Fraudulent Services to Insureds: (i) the Clinic located at 139 N. Central Avenue, Valley Stream, New York; and (ii) the Clinic located at 2426 Eastchester Road, Bronx, New York, are locations that have been the subject of a recent indictment involving numerous individuals who illegally obtained access to confidential patient information and then "referred" the patients for medical treatment from a select network of medical clinics (and lawyers) in New York and New Jersey that paid kickbacks to the indicted individuals. See United States of America v. Anthony Rose, et al., 19-cr-00789(PGG)(S.D.N.Y. 2019).

62.    In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent" by Defendants. They were, in reality, kickbacks for referrals, and the relationship was a "pay-to-play" arrangement. In connection with

this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" for the performance of the Fraudulent Services.

63.    As a result of this arrangement, the unidentifiable laypersons ordered the Clinic "representatives" to direct patients to the Defendants for the performance of Fraudulent Services, which were medically unnecessary and part of a pre-determined fraudulent protocol.

64.    In keeping with the fact that the Clinics controlled the patient base and that the Strobeck PCs were each simply one of several interchangeable "cogs" in the fraud wheel, there were numerous instances between July 2021 and May 2022 where the Strobeck PCs were: (i) allegedly providing the Fraudulent Services on Insureds at a Clinic location at the same time that other medical practices were performing the same type of Fraudulent Services on Insureds, and (ii) were one of numerous "providers" rendering the same type of Fraudulent Services at specific Clinic locations in weekly sequences.

65.    Additionally, one of the Strobeck PCs would allegedly provide the Fraudulent Services on Insureds until the next Strobeck PC started providing the Fraudulent Services from the same clinic location.

66.    The following are representative examples:

(i)    Integrated purported to provide ESWT to an Insured named FDA at the 900 Route 109, Lindenhurst, New York Clinic until October 1, 2021, when FDA purportedly started receiving ESWT from HLAM at the same Clinic location.

(ii)    Integrated purported to provide ESWT to an Insured named CMP at the 139 N. Central Avenue, Valley Stream, New York Clinic until October 12, 2021, when CMP purportedly started receiving ESWT from HLAM at the same Clinic location.

(iii)    Integrated purported to provide ESWT to an Insured named DYA at the 21 Washington Avenue, Brentwood, New York Clinic until September 27, 2021, when DYA purportedly started receiving ESWT from HLAM at the same Clinic location.

(iv)     Integrated purported to provide ESWT to an Insured named AEBS at the 1799 Brentwood Road, Brentwood, New York Clinic until September 29, 2021, when AEBS purportedly started receiving ESWT from HLAM at the same Clinic location.

(v)      Integrated purported to provide ESWT to an Insured named CAP at the 1308 Grand Avenue, Baldwin, New York Clinic until October 14, 2021, when CAP purportedly started receiving ESWT from HLAM at the same Clinic location.

(vi)     HLAM purported to provide ESWT to an Insured named YL at the 164-06 Northern Blvd, Queens, New York Clinic until April 5, 2022, when YL purportedly started receiving ESWT from JS Marble at the same Clinic location.

(vii)    HLAM purported to provide ESWT to an Insured named XL at the 164-06 Northern Blvd, Queens, New York Clinic until March 30, 2022, when XL purportedly started receiving ESWT from JS Marble at the same Clinic location.

(viii)   HLAM purported to provide ESWT to an Insured named JCC at the 164-06 Northern Blvd, Queens, New York Clinic until March 29, 2022, when JCC purportedly started receiving ESWT from JS Marble at the same Clinic location.

(ix)     HLAM purported to provide ESWT to an Insured named WSK at the 164-06 Northern Blvd, Queens, New York Clinic until March 30, 2022, when WSK purportedly started receiving ESWT from JS Marble at the same Clinic location.

(x)      HLAM purported to provide ESWT to an Insured named WS at the 164-06 Northern Blvd, Queens, New York Clinic until April 12, 2022, when WS purportedly started receiving ESWT from JS Marble at the same Clinic location.

67.    The Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to whichever practice was being given access to the Insureds on a given day pursuant to the unlawful payment and referral arrangement.

**C.      Defendants Place the Fraudulent Scheme Into Motion**

68.      Once all the necessary "pieces" were in place and Strobeck had turned control over to the John Doe Defendants, the fraudulent scheme was put into overdrive.  The John Doe Defendants began to illegally operate and manage the Strobeck PCs and implemented the fraudulent financing, billing, and treatment scheme using a "quick hit" strategy, billing GEICO and other New York automobile insurers millions of dollars for the performance of the Fraudulent Services in a matter of months, thereby attempting to limit the insurance companies' ability to investigate and address the scheme.  Thereafter, the John Doe Defendants had the collection lawyers (i.e. Gabriel & Moroff PC) begin billing GEICO and other New York automobile insurers for the Fraudulent Services.

69.      The Defendants' "quick hit" scheme involved using all the Strobeck PCs in sequential order. Between July 26, 2021 and September 24, 2021, Strobeck and the John Doe Defendants used Integrated to bill GEICO and other New York automobile insurers for ESWT purportedly performed on Insureds to "test" the insurance industry to see whether they could obtain money from their fraudulent scheme before GEICO could investigate and address the scheme. During the three (3) month period between July 26, 2021 and September 24, 2021, the Defendants submitted more than 1,035 bills to GEICO involving 218 separate patients and sought more than $759,800.00. As a direct result of the Defendants' scheme, through Integrated, the Defendants fraudulently obtained more than $270,500.00 from GEICO.

70.      After the Defendants tested their fraudulent scheme using Integrated, they abandoned use of the entity and used HLAM in its place. Between September 27, 2021 and March 24, 2022, the Defendants billed GEICO alone more than $1.4 million for Fraudulent Services purportedly performed on Insureds. During that time, the Defendants, through HLAM, submitted more than

1,940 bills to GEICO involving more than 350 separate patients. As a direct result of the Defendants' scheme, through HLAM, the Defendants fraudulently obtained more than $853,900.00 from GEICO.

71.     To perpetuate the scheme, the Defendants then abandoned use of HLAM and began using JS Marble. Between March 29, 2022 and May 25, 2022 (approximately 8 weeks), the Defendants, through JS Marble submitted more than two hundred and eighty (280) bills to GEICO involving more than 100 separate patients, billing GEICO more than $213,100.00.

72.     As part of the scheme, upon information and belief, the John Doe Defendants arranged to have the account receivables associated with the GEICO billings for the Fraudulent Services "funded" through funders with the assistance of the collections lawyers and arranged for documents to be signed directing the payments to be made to them and other third parties rather than Strobeck.

73.     As a result of those efforts the John Doe Defendants received hundreds of thousands, if not millions, of dollars in advances on the claims for the Fraudulent Services from funders without any risk because they were never signatories to the agreements. In addition, the John Doe Defendants had the collection lawyers – Gabriel & Moroff – handle the billing to GEICO and other New York automobile insurers for the Fraudulent Services, and to act as an escrow agent for purposes of clearing the funds through their IOLA/Attorney Trust Account that GEICO paid as a result of the fraudulent claims.  This was done to conceal the identity of the John Doe Defendants, their participation in the scheme and the manner in which they benefited.

74.     Through the funding and collection arrangement, the John Doe Defendants controlled the Strobeck PCs and were able to realize an immediate financial benefit because they were paid a percentage on the face value of the Fraudulent Services billing submitted to GEICO

for the Fraudulent Services. The collection lawyers (in turn) would be compensated through the payment of other monies from the insurance companies, including legal fees associated with the collections as well as interest and other charges to be repaid from the collections on the claims for the Fraudulent Services.

75.     An overwhelming majority of the claims were accompanied by a letter from the collection lawyers, representing that they were legal counsel to Strobeck and the Strobeck PCs in connection with the collection of charges from GEICO for the performance of the Fraudulent Services.

76.     The collection lawyers routinely file expensive and time-consuming individual litigations and/or collection arbitration proceedings against GEICO and other insurers if the charges are not promptly paid in full. The collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, are an essential part of the fraudulent scheme since the Defendants know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving multiple separate professional entities at numerous different clinics located throughout the New York metropolitan area.

**D.      The Fraudulent Billing and Treatment Protocols Employed by the Defendants**

77.     The Fraudulent Services billed in the name of the Strobeck PCs were not medically necessary and were provided, to the extent they were provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds. The Fraudulent Services were further provided pursuant to the

dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

78.     Neither Strobeck nor any other licensed physicians were ever involved in the performance of the Fraudulent Services.  In fact, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base at the Clinics. Once they were given access, the John Doe Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services by unlicensed technicians that they controlled despite there being no clinical basis for the services and submit to purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

79.     In fact, there was no physician involvement with the performance of any of the Fraudulent Services and the only point in having the Insureds seen by the unlicensed technicians was to get the patient's signature on a piece of paper so that the John Doe Defendants could send the claims to the collection lawyers so that they could generate bills and submit them to GEICO seeking payment for the Fraudulent Services to earn their compensation.

80.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the John Doe Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

81.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

82.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. This conclusion is reinforced by the fact that there was no physician involvement in any of the Fraudulent Services allegedly performed on Insureds and billed to GEICO.

**E.      The Fraudulent Charges for "Extracorporeal Shockwave Therapy"**

83.     Defendants purported to systemically subject Insureds to medically unnecessary ESWT "treatments." In keeping with the fact that the Defendants intended to conceal the absence of any physician involvement and that the Strobeck PCs were each just one of several billing entities that they used, the John Doe Defendants arranged to have the services documented on a generic "report."

84.     These reports referenced "RPW" or Radial Pressure Wave and contained one page of check boxes followed by four pages of notes related to the patient and the procedure. Each of these "reports" submitted to GEICO was virtually identical regardless which of the Strobeck PCs allegedly rendered the treatments or which Insured received them. In particular, the "Pre-Procedure Evaluation," "Comments," and "Summary" sections are identical across Strobeck PCs and Insureds. For example, in the "Pre-Procedure Evaluation" section, each report indicates the patient reported a "7/10 pain level... and has difficulty with ADLS of moderately [*sic*] severity." The following are representative examples of the sections mentioned above:

| Integrated | Pre-Procedure Evaluation:<br><br>Based on the objective findings today, active, and passive ROM is decreased moderately, and palpation findings indicate at least mild to moderate pain and patient reports at least a 7/10 pain level in VAS and difficulty with ADLS of moderately severity. Based on these findings and the review of the available medical records it is appropriate for this patient to proceed with initial RPW therapy |
|---|---|
| HLAM | Pre-Procedure Evaluation:<br><br>Based on the objective findings today, active, and passive ROM is decreased moderately, and palpation findings indicate at least mild to moderate pain and patient reports at least a 7/10 pain level in VAS and difficulty with ADLS of moderately severity. Based on these findings and the review of the available medical records, it is appropriate for this patient to proceed with initial RPW therapy. |

| JS Marble | **Pre-Procedure Evaluation:** <br><br> Based on the objective findings today, active, and passive ROM is decreased moderately, and palpation findings indicate at least mild to moderate pain and patient reports at least a 7/10 pain level in VAS and difficulty with ADLs of moderately severity. Based on these findings and the review of the available medical records, it is appropriate for this patient to proceed with initial RPW therapy. |
|---|---|

| Integrated | **Comments:** <br><br> The patient understands the essence of their diagnosis and the reasons for the RPW. Being an acoustic wave that then creates mechanical impulse to tissues, it may provide enhanced diversity in typical contraindications to other therapies where limitations occur based on patient presentation such as a patient with an implanted electromechanical device not being able to receive certain electromagnetic therapies or medications. Being an exogenous therapy with deep penetration, it may also provide a safer alternative to injections. The associated and self-limited risks of the procedure such as swelling, redness, and hematomas, petechial or red spots which may appear after 1-2 days after treatment were thoroughly discussed with the patient. Any alternative to the procedure, including the course of the condition RPW and that no guarantees are made or implied regarding the outcome. The patient has given both verbal and written informed consent for the RPW procedure. |
|---|---|
| HLAM | **Comments:** <br><br> The patient understands the essence of their diagnosis and the reasons for the RPW. Being an acoustic wave that then creates mechanical impulse to tissues, it may provide enhanced diversity in typical contraindications to other therapies where limitations occur based on patient presentation such as a patient with an implanted electromechanical device not being able to receive certain electromagnetic therapies or medications. Being an exogenous therapy with deep penetration, it may also provide a safer alternative to injections. The associated and self-limited risks of the procedure such as swelling, redness, and hematomas, petechial or red spots which may appear after 1-2 days after treatment were thoroughly discussed with the patient. Any alternative to the procedure, including the course of the condition RPW and that no guarantees are made or implied regarding the outcome. The patient has given both verbal and written informed consent for the RPW procedure. |
| JS Marble | **Comments:** <br><br> The patient understands the essence of their diagnosis and the reasons for the RPW. Being an acoustic wave that then creates mechanical impulse to tissues, it may provide enhanced diversity in typical contraindications to other therapies where limitations occur based on patient presentation such as a patient with an implanted electromechanical device not being able to receive certain electromagnetic therapies or medications. Being an exogenous therapy with deep penetration, it may also provide a safer alternative to injections. The associated and self-limited risks of the procedure such as swelling, redness, and hematomas, petechial or red spots which may appear after 1-2 days after treatment were thoroughly discussed with the patient. Any alternative to the procedure, including the course of the condition RPW and that no guarantees are made or implied regarding the outcome. The patient has given both verbal and written informed consent for the RPW procedure. |

| Integrated | **Summary:** <br><br> The patient underwent RPW as described above. The patient tolerated the procedure well, there were no intra-procedure or post-procedure complications. To determine the effectiveness of the RPW and to assess for delayed side effects, days suitability and advisability of subsequent treatments, the patient will be re-evaluated 5-7 days following the procedure. Prior to performing day two of the procedure the patient will complete a VAS and the patient will be evaluated objectively for changes in range of motion, ADLs and palpation findings. The patient was able to achieve increased motion post RPW. The patient also showed decrease in trigger points and muscle spasm." With the improvement of range of motion it is medically reasonable to conclude that this patient's fibro adhesive conditions were significantly impacted; increasing the potential for appropriate neuromuscular re-education of affected myofascial structures and before having re-establishment of collagen deposition during the healing phase. Also, the patient will be evaluated objectively for range of motion and muscle strength. This functional capacity examination will aid us in deciding whether to continue with the subsequent weekly treatments and determined the optimal total number of visits required for this patient. |
|---|---|

24

| HLAM | **Summary:** |
|------|--------------|
|  | The patient underwent RPW as described above. The patient tolerated the procedure well; there were no intra-procedure or post-procedure complications. To determine the effectiveness of the RPW and to assess for delayed side effects, days suitability and advisability of subsequent treatments, the patient will be re-evaluated 5-7 days following the procedure. Prior to performing day two of the procedure the patient will complete a VAS and the patient will be evaluated objectively for changes in range of motion, ADLs and palpation findings. The patient was able to achieve increased motion post-RPW. The patient also showed decrease in trigger points and muscle spasm. With the improvement of range of motion it is medically reasonable to conclude that this patient's fibro-adhesive conditions were significantly impacted; increasing the potential for appropriate neuromuscular re-education of affected myofascial structures and before having reestablishment of collagen deposition during the healing phase. Also, the patient will be evaluated objectively for range of motion and muscle strength. This functional capacity examination will aid us in deciding whether to continue with the subsequent weekly treatments and determined the optimal total number of visits required for this patient. |
| JS Marble | **Summary:** |
|  | The patient underwent RPW as described above. The patient tolerated the procedure well; there were no intra-procedure or post-procedure complications. To determine the effectiveness of the RPW and to assess for delayed side effects, days suitability and advisability of subsequent treatments, the patient will be re-evaluated 5-7 days following the procedure. Prior to performing day two of the procedure the patient will complete a VAS and the patient will be evaluated objectively for changes in range of motion, ADLs and palpation findings. The patient was able to achieve increased motion post-RPW. The patient also showed decrease in trigger points and muscle spasm. With the improvement of range of motion it is medically reasonable to conclude that this patient's fibro-adhesive conditions were significantly impacted; increasing the potential for appropriate neuromuscular re-education of affected myofascial structures and before having reestablishment of collagen deposition during the healing phase. Also, the patient will be evaluated objectively for range of motion and muscle strength. This functional capacity examination will aid us in deciding whether to continue with the subsequent weekly treatments and determined the optimal total number of visits required for this patient. |

85.     In addition to the notes section of the "Radial Pressure Wave Therapy Report," each of the check box sections of the form are identical across Strobeck PCs and Insureds, with the exception of the parts of the body where ESWT was provided.

86.     The following are representative examples:



87.    The fraudulent nature of the documentation is further illustrated by additional similarities.  For example:

(i)    each of these forms list the same treatment parameters: (a) 1.0-1.1 bar pressure intensity; (b) 2000 pulses; (c) 16 Hz frequency; and (d) a black D20 transmitter.

(ii)    virtually every single form submitted by the Strobeck PCs contains these same treatment parameters, regardless of the individual patient's needs or the circumstances of the vehicle accident.

(iii)    The forms also systematically indicated that all three Insureds were suffering from "paraspinal muscle spasms" and "extremity muscle spasms."

88.    The billing data associated with the claims submissions made to GEICO corroborates the fraudulent nature of the billing/treatment protocols.

89.    According to the billing, the Strobeck PCs allegedly performed ESWT "treatment" on Insureds between July 26, 2021 and May 25, 2022, during which time: (i) more than 4,100 separate services were performed; (ii) the services were performed on more than 650 separate patients; (iii) the services were performed at more than twenty-five (25) separate locations; and (iv) the services were provided at multiple locations at the same day, with multiple instances of more than three separate treatment locations in one day.

90.    Once documented by the unidentified technicians, the Defendants then billed GEICO for the performance of ESWT under the tax identification numbers associated with the Strobeck PCs using CPT code 0101T.

**CATEGORY III CODES**

**Medical Fee Schedule**

**0042T–0504T**

**Effective April 1, 2019**

| | | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|---|
| ■ | | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ | + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ | + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ | + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| | + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| | + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy | 2.78 | XXX | |

91.     As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.   Additionally, and as noted in the Fee Schedule, the CPT code (i) is scheduled to be paid using the conversion rate for surgical services, and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

92.     In fact, none of the Fraudulent Services were provided by a licensed physician.

93.     The Defendants' charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature.  In fact, (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) there are no legitimate peer reviewed studies that

establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain; and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

94.     Notwithstanding the experimental nature of ESWT, the Defendants' charges for the medically unnecessary ESWT were also fraudulent in that the Defendants did not even actually provide high energy ESWT that satisfies the requirements of CPT code 0101T. Instead, the Defendants actually provided Radial Pressure Wave Therapy, as noted throughout the "reports" the Defendants submitted to GEICO.  Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave. Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T.

95.     In allegedly providing "ESWT," the Strobeck PCs utilized a portable, compact radial wave pressure device that does not even purport to be able to provide the high energy capacity necessary to produce a true shock wave. Accordingly, even if the ESWT was approved for, or had any documented effectiveness for, the treatment of back, neck, and shoulder pain – which it does not – the Strobeck PCs did not even provide high energy ESWT treatments, but merely a form of pressure wave therapy that the Defendants fraudulently billed under CPT code 0101T.

96.     Despite actually providing Radial Pressure Wave Therapy, the Defendants purported to provided "ESWT" to virtually every Insured as part of a pre-determined fraudulent protocol without regard to each Insured's individual complaints, symptoms, or presentation.  In

furtherance of that, the ESWT was provided to Insureds soon after their accident without giving the patients the opportunity to sufficiently respond to conservative therapies.

97.    For example, Integrated and HLAM typically rendered ESWT to Insureds less than twenty (20) days after the accidents, including the following examples:

(i)    Integrated purported to provide ESWT to an Insured named RM on August 18, 2021, only two days after the Insured's accident on August 16, 2021.

(ii)    Integrated purported to provide ESWT to an Insured named MAD on July 30, 2021, only five days after the Insured's accident on July 25, 2021.

(iii)    Integrated purported to provide ESWT to an Insured named RC on July 30, 2021, only five days after the Insured's accident on July 25, 2021.

(iv)    Integrated purported to provide ESWT to an Insured named JLL on August 11, 2021, six days after the Insured's accident on August 5, 2021.

(v)    Integrated purported to provide ESWT to an Insured named JR on August 16, 2021, only seven days after the Insured's accident on August 9, 2021.

(vi)    HLAM purported to provide ESWT to an Insured named LC on November 12, 2021, only one day after the Insured's accident on November 11, 2021.

(vii)    HLAM purported to provide ESWT to an Insured named TML on February 23, 2022, only one day after the Insured's accident on February 22, 2022.

(viii)    HLAM purported to provide ESWT to an Insured named DJ on October 15, 2021, only two days after the Insured's accident on October 13, 2021.

(ix)    HLAM purported to provide ESWT to an Insured named DSG on January 12, 2022, only three days after the Insured's accident on January 9, 2022.

(x)    HLAM purported to provide ESWT through to an Insured named DR on December 15, 2021, only four days after the Insured's accident on December 11, 2021.

98.    Additionally, and as part of the pre-determined fraudulent protocol, the Strobeck PCs routinely provided ESWT to multiple Insureds involved in the same accident from the same Clinics regardless of any differences in injuries or symptomatology.  The following are representative examples:

(i)     On May 9, 2021, three Insureds – AA, GH, and ARR – were involved in the same automobile accident. Thereafter, AA, GH, and ARR all presented to a Clinic located at 1799 Brentwood Road, Brentwood, New York ("Brentwood Clinic"), and each purportedly received ESWT from Integrated on August 4, 2021.

(ii)    On August 23, 2021, two Insureds – FA and FDA – were involved in the same automobile accident. Thereafter, FA and FDA both presented to a Clinic located at 900 Route 109, Lindenhurst, New York, ("Route 109 Clinic"), and each purportedly received ESWT from Integrated on September 3, 2021.

(iii)   On March 27, 2021, two Insureds – AVB and RLVB – were involved in the same automobile accident. Thereafter, AVB and RLVB both presented to a Clinic located at 21 Washington Avenue, Brentwood, New York ("Washington Ave Clinic") and each purportedly received ESWT from Integrated on July 26, 2021.

(iv)    On August 11, 2021, two Insureds – JAC, and KMC – were involved in the same automobile accident. Thereafter, JAC and KMC both presented to the Route 109 Clinic. JAC and KMC each purportedly received ESWT from Integrated on September 10, 2021.

(v)     On September 1, 2021, two Insureds – YFE and MAN – were involved in the same automobile accident. Thereafter, YFE and MAN both presented to the Route 109 Clinic and each purportedly received ESWT from Integrated on September 17, 2021.

(vi)    On November 5, 2021, two Insureds – JK and DK– were involved in the same automobile accident. Thereafter, JK and DK both presented to a Clinic located at 2799 S Route 112, Medford, New York ("Medford Clinic") and each purportedly received ESWT from HLAM on November 8, 2021.

(vii)   On June 11, 2021, two Insureds – MJG and JAG – were involved in the same automobile accident. Thereafter, MJG and JAG both presented to the Washington Ave Clinic, and each purportedly received ESWT from HLAM on November 2, 2021.

(viii)  On September 5, 2021, two Insureds – JAP and JMA – were involved in the same automobile accident. Thereafter, JAP and JMA both presented to the Medford Clinic, and each purportedly received ESWT from HLAM on November 24, 2021.

(ix)    On January 23, 2022, three Insureds – CD, HLF, and SFW – were involved in the same automobile accident. Thereafter, CD, HLF, and SFW all presented to a Clinic located at 164-06 Northern Blvd, Queens, New York

("Northern Blvd Clinic"), and each purportedly received ESWT from HLAM on February 15, 2022.

(x)     On November 22, 2021, two Insureds – CG and CL – were involved in the same automobile accident. Thereafter, CG and CL both presented to the Brentwood Clinic, and each purportedly received ESWT from HLAM on December 15, 2021.

(xi)    On June 13, 2021, three Insureds – RS, NS, and IC– were involved in the same automobile accident. Thereafter, RS, NS, and IC, all presented to a Clinic located at 513 Church Avenue, Brooklyn, New York ("Church Ave Clinic"), and each purportedly received ESWT from HLAM on October 6, 2021.

(xii)   On November 10, 2020, two Insureds – YR and FR – were involved in the same automobile accident. Thereafter, YR and FR both presented to the Northern Blvd Clinic, and each purportedly received ESWT from JS Marble on April 13, 2022.

(xiii)  On December 19, 2021, two Insureds – MAR and RA – were involved in the same automobile accident. Thereafter, MAR and RA both presented the Northern Blvd Clinic, and each purportedly received ESWT from JS Marble on March 30, 2022.

(xiv)   On October 17, 2021, two Insureds – TS and YF – were involved in the same automobile accident. Thereafter, TS and YF both presented to the Northern Blvd Clinic, and each purportedly received ESWT from JS Marble on March 29, 2022.

(xv)    On October 27, 2021, two Insureds – LX and XL – were involved in the same automobile accident. Thereafter, LX and XL both presented to the Northern Blvd Clinic, and each purportedly received ESWT from JS Marble on March 30, 2022.

99.     It is improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology that would require experimental ESWT treatments, to the extent ESWT was even medically necessary. In all of the claims identified in Exhibit "1" for ESWT, the Defendants falsely represented that the ESWT "treatments" were medically necessary, when in fact they were not medically necessary for each Insured, were provided -to the extent provided at all - pursuant to

pre-determined fraudulent protocols established by the Defendants and were therefore not eligible to collect No-Fault Benefits in the first instance.

100.    In addition to the billing for ESWT being fraudulent for the reasons described above, the charges were also fraudulent because the bills misrepresented the amounts collectible for each date of service.  More specifically, CPT Code 0101T only contemplates billing for the code once per date of service. The code specifically describes the service as pertaining to the "musculoskeletal system", not a patient's individual limb or spine/trunk sections.

101.    Notwithstanding the clear language of the code, the bills fraudulently unbundled the service in the billing that was prepared and submitted by duplicating the code multiple times (and increasing the corresponding charges) and submitting multiple separate bills to GEICO for each area of the body where the ESWT was performed- sometimes also duplicating charges for a corresponding office consultation or office visit billed along with the ESWT.

102.    In doing so, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by two (2) to three (3) times for virtually every date of service. The following are representative examples:

## Integrated

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 08/11/21 | 1799 BRENTWOOD RD Brentwood NY 11717 | SHOCKWAVE THERAPY L/SP | 0101T | 700.39 |
| | | | TOTAL CHARGES TO DATE$ | $ 700.39 |

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 08/11/21 | 1799 BRENTWOOD RD Brentwood NY 11717 | SHOCKWAVE THERAPY C/SP | 0101T | 700.38 |
| | | | TOTAL CHARGES TO DATE$ | $ 700.38 |

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 08/11/21 | 1799 BRENTWOOD RD Brentwood NY 11717 | SHOCKWAVE THERAPY T/SP | 0101T | 700.39 |
| 08/11/21 | 1799 BRENTWOOD RD Brentwood NY 11717 | OFFICE/OUTPAT VISIT, EST PAT 10 MINS | 99212 - 25 | 68.82 |
| | | | TOTAL CHARGES TO DATE$ | $ 769.21 |

## HLAM

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 09/28/21 | 2098 ROCKAWAY PKWY Brooklyn NY 11236 | SHOCKWAVE THERAPY T/SP | 0101T | 700.39 |
| 09/28/21 | 2098 ROCKAWAY PKWY Brooklyn NY 11236 | OFFICE CONSULTATION 15 MINS | 99241 - 25 | 152.86 |
| | | | TOTAL CHARGES TO DATE$ | $ 853.25 |

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 09/28/21 | 2098 ROCKAWAY PKWY Brooklyn NY 11236 | SHOCKWAVE THERAPY L/SP | 0101T | 700.39 |
| 09/28/21 | 2098 ROCKAWAY PKWY Brooklyn NY 11236 | OFFICE CONSULTATION 15 MINS | 99241 - 25 | 152.86 |
| | | | TOTAL CHARGES TO DATE$ | $ 853.25 |

## JS Marble

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 04/05/22 | 164-06 NORTHERN BLVD Flushing NY 11358 | SHOCKWAVE THERAPY C/SP | 0101T | 700.39 |
| | | | TOTAL CHARGES TO DATE$ | $ 700 39 |

**15 REPORT OF SERVICES RENDERED – ATTACH ADDITIONAL SHEETS IF NECESSARY**

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 04/05/22 | 164-06 NORTHERN BLVD Flushing NY 11358 | SHOCKWAVE THERAPY T/SP | 0101T | 700.39 |
| 04/05/22 | 164 06 NORTHERN BLVD Flushing NY 11358 | OFFICE/OUTPAT VISIT, EST PAT 10 MINS | 99212 - 25 | 68.82 |
| | | | TOTAL CHARGES TO DATE$ | $ 769.21 |

103.    Each of the Strobeck PCs submitted these duplicate bills for Fraudulent Services an Insured allegedly received on the same date of service. In an effort to further disguise the unbundling of these charges, Strobeck PCs submitted each of the bills with its own cover letter and assigned it a different "file number."

104.    The following is a representative example from Integrated:

105.    Accordingly, even if the ESWT was approved for, or had any documented effectiveness for, the treatment of back, neck, and shoulder pain – which it does not – the Defendants fraudulently and grossly inflated the charges to financially enrich the Defendants.

**F.    The Fraudulent Billing for Independent Contractor Services**

106.    The Defendants' fraudulent scheme also included the submission of claims to GEICO using the Strobeck PCs seeking payment for services provided by individuals that the Strobeck PCs never employed.

107.    Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors.  The healthcare services must be provided by the billing provider itself, or by its employees.

108.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the

New York Comprehensive Motor Vehicle Insurance Reparations Act…"); <u>DOI Opinion Letter</u>, October 29, 2003 (extending the independent contractor rule to hospitals).

109.    From July 2021 through May 2022, more than 3,200 separate bills were sent to GEICO using the United States mails seeking payment for the Fraudulent Services purportedly performed by individuals other than Strobeck, while falsely representing in every bill that Strobeck was the provider of the service in question. This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill for eligibility if an accurate representation had been made regarding who actually performed the services and their relationship to the billing provider, which was being unlawfully operated and controlled by the John Doe Defendants.

110.    The Defendants' attempt to conceal the fact that the Fraudulent Services, to the extent provided at all, were provided by independent contractors rather than Strobeck can be seen in the Defendants' billing submissions. Almost every report submitted by the Strobeck PCs lists the name and signature of a physician's assistant alongside Strobeck's stamped signature. Despite this, every NF-3 form that the Defendants submitted to GEICO represented that Strobeck was the treating provider, as follows:

| Integrated |  |
| --- | --- |
| HLAM |  |

| JS Marble | 16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING: | | | | | |
|---|---|---|---|---|---|---|
| | TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO. | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| | | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| | STROBECK, JOHN E | MD | 130683-01 | | ☐ | Owner |

111.    These statements in each of the NF-3 forms were false and fraudulent in that physicians' assistants actually performing the Fraudulent Services were never (i) employed by Strobeck or any of the Strobeck PCs, or (ii) under Strobeck's direction and/or control. The fact that the services were neither performed or supervised by Strobeck is evidenced by the fact that all of the reports submitted by the Strobeck PCs contain one of three of versions of Strobeck's stamped signatures. The following is an example:

| Integrated |  |
|---|---|
| HLAM |  |



112.    In fact, the physicians' assistants were simultaneously performing services for multiple other "providers" being operated and controlled by the John Doe Defendants and were paid without regard to the physician's name or entity through whom the Fraudulent Services were billed.

113.    In keeping with the fact that the physicians' assistants performed the Fraudulent Services under the operation and control by the John Doe Defendants, without regard to the physician's name or entity that billed for the Fraudulent Services, virtually all of the Insureds identified in Exhibit "1" received ESWT from various providers, including many of the Strobeck PCs, at a single Clinic. For example:

> (i)     An Insured named SJA was involved in an automobile accident and presented to the Clinic located at 535 Broad Hallow Road, Melville, New York (the "Melville Clinic"). While treating at the Melville Clinic, SJA purportedly received ESWT from Strobeck through Integrated, and also purportedly received ESWT from: (i) Garden Medical Care, P.C.; and (ii) Denny Xavier Rodriguez, M.D.
>
> (ii)    An Insured named PFS was involved in an automobile accident and presented to the Clinic located at 1065 Old Country Road, Westbury, New York (the "Westbury Clinic"). While treating at the Westbury Clinic, PFS purportedly received ESWT from Strobeck through Integrated, and also purportedly received ESWT from: (i) Town Medical Care, P.C.; and (ii) Denny Xavier Rodriguez, M.D.
>
> (iii)   An Insured named TF was involved in an automobile accident and presented to the Medford Clinic. While treating at the Medford Clinic, TF purportedly received ESWT from Strobeck through Integrated, and also purportedly

received ESWT from: (i) Dinesh Verma Medical, P.C.; and (ii) Garden Medical Care, P.C.

(iv)    An Insured named EB was involved in an automobile accident and presented to the Clinic located at 179 Great East Neck Road, West Babylon, New York (the "West Babylon Clinic"). While treating at the West Babylon Clinic, EB purportedly received ESWT from Strobeck through Integrated, and also purportedly received ESWT from: (i) Jean Pierre Barakat, M.D.; and (ii) Denny Xavier Rodriguez, M.D.

(v)    An Insured named KD was involved in an automobile accident and presented to the Clinic located at Westbury Clinic. While treating at the Westbury Clinic, KD purportedly received ESWT from Strobeck through Integrated, and also purportedly received ESWT from: (i) Town Medical Care, P.C.; and (ii) Denny Xavier Rodriguez, M.D.

(vi)    An Insured named JA was involved in an automobile accident and presented to the Clinic located at 139 N. Central Avenue, Brooklyn, New York ("the Central Ave Clinic"). While treating at the Central Ave Clinic, JA purportedly received ESWT from Strobeck through HLAM, and also purportedly received ESWT from: (i) Dinesh Verma Medical, P.C.; and (ii) Garden Medical Care, P.C.

(vii)    An Insured named MP was involved in an automobile accident and presented to the Clinic located at 2098 Rockaway Parkway, Brooklyn, New York (the "Rockaway Clinic"). While treating at the Rockaway Clinic, MP purportedly received ESWT from Strobeck through HLAM, and also purportedly received ESWT from: (i) 334 Grand Concourse; and (ii) Garden Medical Care, P.C.

(viii)    An Insured named WH was involved in an automobile accident and presented to the Church Ave Clinic. While treating at the Church Ave Clinic, WH purportedly received ESWT from Strobeck through HLAM, and also purportedly received ESWT from: (i) Macintosh Medical, P.C.; and (ii) Garden Medical Care, P.C.

(ix)    An Insured named PG was involved in an automobile accident and presented to the Medford Clinic. While treating at the Medford Clinic, PG purportedly received ESWT from Strobeck through HLAM, and also purportedly received ESWT from from: (i) Dinesh Verma Medical, P.C.; and (ii) Garden Medical Care, P.C.

(x)    An Insured named JHR was involved in an automobile accident and presented to the Church Ave Clinic. While treating at the Church Ave Clinic, JHR purportedly received ESWT from Strobeck through HLAM, and also purportedly received ESWT from: (i) Macintosh Medical P.C.; and (ii) Garden Medical Care, P.C.

114.     These are only representative samples. Virtually all the Insureds identified in Exhibit "1" treated at Clinics that employed unlicensed technicians to perform the Fraudulent Services on Insureds, which were subsequently billed to GEICO and other New York automobile insurers through multiple healthcare providers that did not perform or directly supervise the Fraudulent Services.

115.     Because the Fraudulent Services, to the extent provided at all, were performed by individuals not employed by Strobeck and/or the Strobeck PCs, the Defendants never had any right to bill or to collect No-Fault Benefits for that reason or to realize any economic benefit from the claims seeking payment for the Fraudulent Services, in addition to all others identified in this Complaint. The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead GEICO into believing that it was obligated to pay the claim submissions.

**III.     The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

116.     To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted to GEICO thousands of NF-3 forms, AOBs and medical reports/records using the name of the Strobeck PCs and their tax identification numbers seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

117.     The NF-3 forms, reports, AOBs and other documents submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

> (i)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that Strobeck had performed the Fraudulent Services and that his name, license and the tax identification numbers of the Strobeck PCs were being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the John Doe Defendants unlawfully and secretly controlled, operated and managed each medical "practice".

(ii)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided.

(iii)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly concealed the fact that the Fraudulent Services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements.

(iv)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

(v)      The NF-3 forms, letters and other supporting documentation submitted by, and on behalf of, the Defendants, uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 even though the services were provided by unlicensed individuals not employed by Strobeck or any of the Strobeck PCs.

## IV.     <u>Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance</u>

118.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

119.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme and went to great lengths to accomplish this concealment.

120.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Strobeck in the performance of the Fraudulent Services and Strobeck's ownership, control and/or management of the Strobeck PCs. Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

121.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent they were performed at all, pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.  In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed individuals to prevent GEICO from discovering that the Fraudulent Services were not eligible for reimbursement because they were not provided by individuals that were employed by Strobeck and/or any of the Strobeck PCs.

122.    GEICO takes steps to timely respond to all claims and to ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,138,400.00 based upon the fraudulent charges.

123.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Against Integrated, HLAM, and JS**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

124.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

125.     There is an actual case and controversy between GEICO on the one hand and Integrated, HLAM, and JS on the other hand regarding more than $1,214,900.00 in unpaid billing for the Fraudulent Services that were submitted to GEICO.

126.     Integrated, HLAM, and JS have no right to receive payment from GEICO on the unpaid billing because the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers.

127.     Integrated, HLAM, and JS have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to illegal kickbacks and referral relationships between the Defendants and the Clinics.

128.     Integrated, HLAM, and JS have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

129.     Integrated, HLAM, and JS have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

130.     Integrated, HLAM, and JS have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

131.     Integrated, HLAM, and JS have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented that they were performed by Strobeck and were instead performed - to the extent that they were provided at all - by individuals who were neither supervised by nor employed by Strobeck, Integrated, HLAM, or JS.

132.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Integrated, HLAM, and JS have no right to receive payment for any pending bills submitted to GEICO.

## AS AND FOR A SECOND CAUSE OF ACTION
**Against Strobeck and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

133.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

134.     Integrated, HLAM, and JS together constitute an association-in-fact "enterprise" (the "Strobeck Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

135.     The members of the Strobeck Fraud Enterprise are and have been associated through time, joined in purposed and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Integrated, HLAM, and JS are independent businesses entities – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

136.    The Strobeck Fraud Enterprise operated under three separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Strobeck Fraud Enterprise acting singly or without the aid of each other.

137.    The Strobeck Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

138.    Strobeck and the John Doe Defendants each has been employed by and/or associated with the Strobeck Fraud Enterprise.

139.    Strobeck and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Strobeck Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Strobeck Fraud Enterprise was not

eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Strobeck or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Strobeck or employed by any of the Strobeck PCs. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

140.    Strobeck Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Strobeck and the John Doe Defendants operate the Strobeck Fraud Enterprise, inasmuch as the Strobeck PCs never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the enterprise to function. Furthermore, the intricate planning required to carry

out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Integrated, HLAM, and JS to the present day.

141.    The Strobeck Fraud Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the Strobeck Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,138,400.00 pursuant to the fraudulent bills submitted by the Strobeck and the John Doe Defendants through the Strobeck Fraud Enterprise.

142.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Against Strobeck and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

143.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

144.    The Strobeck Fraud Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

145.    Strobeck and the John Doe Defendants are employed by and/or associated with the Strobeck Fraud Enterprise.

146.    Strobeck and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Strobeck Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of

the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the Integrated, HLAM, and JS were not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Strobeck or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Strobeck or employed by any of the Strobeck PCs.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

147.    Strobeck and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

148.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,138,400.00 pursuant to the fraudulent bills submitted by Defendants through Integrated, HLAM, and JS.

149.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>**
**Against Strobeck and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

150.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

151.    Integrated is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Strobeck and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Integrated's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that Integrated was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, and not properly licensed, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-

determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Strobeck or any other licensed physician, but by persons who were not directly supervised by Strobeck or employed by Integrated. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

152.    Integrated's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Strobeck and the John Doe Defendants operate Integrated, inasmuch as Integrated never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for Integrated to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Integrated to the present day.

153.    Integrated is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by Integrated in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid

50

at least $270,500.00 pursuant to the fraudulent bills submitted by the Strobeck and the John Doe Defendants through Integrated.

154.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Against Strobeck and John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

155.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

156.    Integrated is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

157.    Strobeck and the John Doe Defendants are employed by and/or associated with the Integrated.

158.    Strobeck and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Integrated's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that Integrated was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial

arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Strobeck or any other licensed physician, but by persons who were not directly supervised by Strobeck or employed by Integrated.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

159.    Strobeck and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

160.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $270,500.00 pursuant to the fraudulent bills submitted by Defendants through Integrated.

161.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Against Integrated, Strobeck, and John Doe Defendants**
**(Common Law Fraud)**

162.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

163.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services under the name of Integrated.

164.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Strobeck had performed the Fraudulent Services and that his name, license and the tax identification number of the Integrated was being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Strobeck never performed any of the services and the John Doe Defendants unlawfully and secretly controlled, operated and managed Integrated; (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed for services were eligible for payment because the services were provided by Strobeck, when in fact the services were provided by individuals that were never supervised by Strobeck nor employed by Integrated.

165.    Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Integrated that were not compensable under New York no-fault insurance laws.

166.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $270,500.00 pursuant to the fraudulent bills submitted by the Defendants.

167.    Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

168.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Integrated, Strobeck, and John Doe Defendants
### (Unjust Enrichment)

169.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

170.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

171.    When GEICO paid the bills and charges submitted by or on behalf Integrated for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

172.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

173.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

174.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $270,500.00.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**Against Strobeck and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

175.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

176.    HLAM is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. HLAM and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of HLAM's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that HLAM was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of

illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Strobeck or any other licensed physician, but by persons who were not directly supervised by Strobeck or employed by HLAM. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

177.    HLAM's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Strobeck and the John Doe Defendants operate HLAM, inasmuch as HLAM never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for HLAM to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through HLAM to the present day.

178.    HLAM is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by HLAM in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at

least $853,900.00 pursuant to the fraudulent bills submitted by Strobeck and the John Doe Defendants through HLAM.

179.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A NINTH CAUSE OF ACTION
**Against Strobeck and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

180.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

181.    HLAM is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

182.    Strobeck and the John Doe Defendants are employed by and/or associated with HLAM.

183.    Strobeck and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the HLAM's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that HLAM was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial

arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services - to the extent provided at all - were not provided by Strobeck or any other licensed physician, but by persons who were not directly supervised by Strobeck or employed by HLAM.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

184.    Strobeck and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

185.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $853,900.00 pursuant to the fraudulent bills submitted by Defendants through HLAM.

186.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A TENTH CAUSE OF ACTION
**Against HLAM, Strobeck, and John Doe Defendants**
**(Common Law Fraud)**

187.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

188.    Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services. Under the name of HLAM.

189.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Strobeck had performed the Fraudulent Services and that him name, license and the tax identification number of HLAM was being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Strobeck never performed any of the services and the  John Doe Defendants unlawfully and secretly controlled, operated and managed HLAM; (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed for services were eligible for payment because the services were provided by Strobeck, when in fact the services were provided by individuals that were never supervised by Strobeck nor employed HLAM.

190.    Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through HLAM that were not compensable under New York no-fault insurance laws.

191.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $853,900.00 pursuant to the fraudulent bills submitted by the Defendants.

192.    Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

193.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
**Against HLAM, Strobeck, and John Doe Defendants**
**(Unjust Enrichment)**

194.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

195.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

196.    When GEICO paid the bills and charges submitted by or on behalf of HLAM for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

197.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

198.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

199.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $853,900.00.

<strong>AS AND FOR A TWELFTH CAUSE OF ACTION</strong><br><strong>Against JS, Strobeck, and John Doe Defendants</strong><br><strong>(Common Law Fraud)</strong>

200.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

201.    Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services under the name of JS.

202.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Strobeck had performed the Fraudulent Services and that him name, license and the tax identification number of JS was being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Strobeck never performed any of the services and the  John Doe Defendants unlawfully and secretly controlled, operated and managed JS; (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of

the services that purportedly were provided; (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed for services were eligible for payment because the services were provided by Strobeck, when in fact the services were provided by individuals that were never supervised by Strobeck nor employed JS Marble.

203.    Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through JS Marble that were not compensable under New York no-fault insurance laws.

204.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $14,000.00 pursuant to the fraudulent bills submitted by the Defendants.

205.    Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

206.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR AN THIRTEENTH CAUSE OF ACTION
### Against JS, Strobeck, and John Doe Defendants
### (Unjust Enrichment)

207.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

208.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

209.    When GEICO paid the bills and charges submitted by or on behalf of JS for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

210.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

211.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

212.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $14,000.00.

## JURY DEMAND

213.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Cause of Action against Integrated, HLAM, and JS, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Integrated, HLAM, and JS have no right to receive payment for any pending bills for the Fraudulent Services submitted to GEICO;

B.      On the Second Cause of Action against Strobeck and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,138,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Strobeck and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,138,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Strobeck and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $270,500.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against Strobeck and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $270,500.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.      On the Sixth Cause of Action against Integrated, Strobeck, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $270,500.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

G.      On the Seventh Cause of Action against Integrated, Strobeck, and John Doe Defendants, more than $270,500.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.    On the Eighth Cause of Action against Strobeck and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $853,900.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.    On the Ninth Cause of Action against Strobeck and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $853,900.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.    On the Tenth Cause of Action against HLAM, Strobeck, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $853,900.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

K.    On the Eleventh Cause of Action against HLAM, Strobeck, and John Doe Defendants, more than $853,900.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

L.    On the Twelfth Cause of Action against JS, Strobeck, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $14,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper; and

M.    On the Thirteenth Cause of Action against JS, Strobeck, and John Doe Defendants, more than $14,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:  December 8, 2022

RIVKIN RADLER LLP

By:____*/s/ Barry I. Levy*_____
        Barry I. Levy, Esq.
        Michael Sirignano, Esq.
        Jennifer Abreu, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*