UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
GOVERNMENT EMPLOYEES
INSURANCE COMPANY, GEICO
INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                                        **REPORT AND**
                                        **RECOMMENDATION**
                    Plaintiffs,         CV 22-7477 (MKB)(AYS)

        -against-

JOHN STROBECK, M.D., INTEGRATED
DIAGNOSTIC IMAGING & CARDIOLOGY
OF STATEN ISLAND P.C., HEART LUNG
ASSOCIATES MEDICAL, P.C., JS
MARBLE MEDICAL CARE, P.C. a/k/a
JS MARBLE MEDICAL P.C., HEART-
LUNG CENTER CONSULTANTS, INC.,
DANOO NOOR SR. a/k/a DAN NOOR,
MDX SOLUTIONS GROUP INC., ORBITIS
GROUP LLC, CLINICAL VENTURES LLC,
BALIUS LLC, and JOHN DOE DEFENDANTS
"1" through "10,"

                    Defendants.
-------------------------------------------------X
**SHIELDS, Magistrate Judge,**

        Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs") commenced this action against Defendants John Strobeck, M.D. ("Strobeck"),

Integrated Diagnostic Imaging & Cardiology of Staten Island P.C. ("Integrated"), Heart Lung

Associates Medical, P.C. ("HLAM"), JS Marble Medical Care P.C. a/k/a JS Marble Medical

P.C. ("JS Marble") (collectively the "Strobeck PCs"), Heart-Lung Center Consultants, Inc.

("HLC Consultants"), Danoo Noor Sr. a/k/a Dan Noor ("Noor"), MDX Solutions Group Inc.

("MDX Solutions"), and Orbitis Group LLC ("Orbitis") (collectively the "Management Defendants") (together the "defaulting Defendants") for fraud against Strobeck, the Strobeck PCs and the Management Defendants, and against HLC Consultants for aiding and abetting fraud, unjust enrichment, and a declaratory judgment, alleging that Defendants engaged in a scheme to submit fraudulent charges for medically unnecessary healthcare services for covered individuals under New York's no-fault insurance law.

The case was commenced in December of 2022. See Compl., Docket Entry ("DE") [1]. The defaulting Defendants failed to answer and Plaintiffs thereafter requested entry of a certificate of default. The Clerk of the Court has issued those certificates, and Plaintiffs have moved for entry of judgment thereon. Presently before this Court is the District Court's referral of Plaintiffs' motion for issuance of a Report and Recommendation as to whether Plaintiffs have established the defaulting Defendants' liability such that the motion should be granted, and if so, to determine the appropriate amount of damages, costs, and/or fees, if any, awarded. For the reasons set forth below, this Court respectfully recommends that GEICO's motion for default judgment be granted.

BACKGROUND

The following facts, adduced from Plaintiffs' Amended Complaint, the declaration of Jennifer Abreu ("Abreu Decl."), the declaration of Kathleen Asmus ("Asmus Decl."), and the exhibits attached thereto, are undisputed and taken as true for purposes of deciding this motion. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992).

GEICO, a Nebraska corporation with its principal place of business in Maryland, underwrites automobile insurance in New York." (Am. Compl., DE [43], ¶¶ 22, 37). Under New York's Comprehensive Motor Vehicle Insurance Reparations Act, N.Y. Ins. Law § 5101, and its

associated regulations, N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 11, § 65 et seq., GEICO is required to provide Personal Injury Protection benefits ("No-fault benefits") to GEICO policyholders. (Am. Compl. ¶ 38). No-fault benefits include up to $50,000 per insured person for "necessary expenses incurred for health care goods and services, including medical services." (Id. ¶ 39). An insured person can assign his or her rights to these no-fault benefits to healthcare providers, who then submit claims to GEICO to receive payment using claim forms, such as NF-3 or HCFA-1500 form. (Id. ¶¶ 40-41).

Under the no-fault insurance law, a provider is not eligible for reimbursement if it fails to meet any of the applicable licensing requirements. (Am. Compl. ¶¶ 42-43) (citing N.Y.C.R.R. tit. 11, § 65-3.16(a)(12)). Among other things, these requirements prohibit individuals without a professional license from owning or controlling healthcare corporations, from deriving economic benefit from physician services, and from "paying or accepting kickbacks in exchange for patient referrals." (Id. ¶¶ 44-46). Providers that do not comply with licensing requirements are not eligible to collect no-fault benefits, and only licensed physicians may practice medicine in New York. (Id. ¶ 47-49 (first citing State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005); and then citing Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019))). Only a healthcare provider directly assigned no-fault benefits is eligible to bill for or collect from an insurer, (id. ¶ 50), and corporations cannot seek reimbursement for services provided by an independent contractor. (Id. ¶ 51).

Defendant Strobeck resides in and is a citizen of New Jersey. (Am. Compl. ¶ 22). Strobeck is a physician licensed to practice medicine in New York. (Id.). GEICO alleges that Strobeck agreed to the formation of the Strobeck PCs and to "front" as the Strobeck PCs' owner while allowing the Management Defendants to use his license and the Strobeck PCs as "vehicles

to submit fraudulent claims to GEICO. (Id.). Integrated is a New York professional corporation with its principal place of business in New York. (Id. ¶ 23). Integrated was licensed as a professional service corporation with the New York State Office of Professions from April 15, 2005, through March 31, 2020, but was not licensed at the time it is claims to have provided the fraudulent services in 2021. (Id.). HLAM is New York professional corporation with its principal place of business in New York. (Id. ¶ 25.) JS Marble is a New York professional corporation with its principal place of business in New York. (Id. ¶ 26). HLC Consultants is a New Jersey corporation with its principal place of business in New Jersey. (Id. ¶ 27). Noor resides in and is a citizen of New York. (Id. ¶ 28). GEICO alleges that Noor secretly and unlawfully owned, operated, managed and controlled the Strobeck PCs, along with the other Management Defendants, by virtue of the control he exercised over Strobeck PCs' operations and profits, as well as the services purportedly provided to Insureds at the Clinics.  (Id. ¶ 28). MDX Solutions is a New York corporation with its principal place of business in New York and is owned by Noor. (Id. ¶ 29). Orbitis Group is a New York limited liability company with its principal place of business in New York. (Id. ¶ 30). Orbitis Group's sole member is Noor. (Id.). The Defendants are alleged to be involved in schemes to defraud GEICO through New York's no-fault insurance system. (Id. ¶ 1).

GEICO alleges that the defaulting Defendants ran a fraudulent scheme where unlicensed technicians would perform services at a large number of clinics and generate falsified reports to justify medically unnecessary services; the defaulting Defendants would then send these falsified reports, documents, and bills to GEICO seeking reimbursement for the services. (Am. Compl. ¶¶ 8-9). GEICO alleges that the defaulting Defendants established illegal referral and kickback arrangements to provide the defaulting Defendants with access to a steady stream of patients,

fraudulently bill GEICO, and exploit New York's no-fault insurance system solely for financial gain without regard to genuine patient care." (Id. ¶ 11).

The defaulting Defendants engineered this scheme on the heels of material changes adopted by the New York State Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule (" Fee Schedule") to New York's no-fault reimbursement. (Am. Compl. ¶ 6). Those changes eliminated billing abuses and treatment practices that had plagued the automobile industry for more than a decade by, among other things, making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement, and controlling reimbursement among providers who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines. (Id.). In contrast, the Fee Schedules changes did not materially alter reimbursement for the performance of patient exams and extracorporeal shockwave therapy ("ESWT") ("collectively, the "Fraudulent Services"), and for the first time, established a definitive rate of reimbursement of approximately $700 for ESWT. (Id. ¶ 7).

The defaulting Defendants subjected the Insureds to initial examinations and consultations, which were performed as a "gateway" in order to provide Insureds with an excessive number of pre-determined "diagnoses" that served as a purported justification for the exploitation of the Insureds through the purported performance of ESWT. (Am. Compl. ¶ 120). Following the initial examinations and consultations with unlicensed technicians, the defaulting Defendants subjected virtually every Insured to ESWT without regard to each Insured's individual complaints, symptoms, or presentation. (Id. ¶¶ 120, 133).

The defaulting Defendants then billed GEICO for the Fraudulent Services using billing codes that misrepresented and exaggerated the level and type of healthcare services that were

purportedly provided in order to inflate the charges submitted to GEICO. (Am. Compl. ¶¶ 121-139).

The billing for the Fraudulent Services would be "funded" through companies and the advances paid by the "funding" companies would be paid to the Management Defendants, as well as other unlicensed individuals and entities, as part of a money laundering aspect of the scheme designed to continue the scheme's operation and profit from the fraudulent scheme. (Am. Compl. ¶ 8).

Critical to the success of the fraudulent scheme was the recruitment of a licensed physician. The Management Defendants recruited Strobeck to "front" as the owner of "medical practices," which Strobeck accepted in exchange for periodic payments. (Am. Compl. ¶ 9). The Strobeck PCs maintained no stand-alone offices of their own, had no patients of their own, and provided no legitimate or medically necessary services. (Id. ¶ 10). One of the medical practices – Integrated – was not even licensed by the New York State Department of Education at the time it was used to render the Fraudulent Services. (Id.).

The Management Defendants established relationships with layperson that are associated with the Clinics, collected the no fault-claims from the Clinics fir services that were allegedly provided to individuals and referred the no-fault billing and collection to New York collection lawyers. (Am. Compl. ¶ 11). The Management Defendants established illegal referral and kickback arrangement with owners and/or managers of the clinics to allow the Defendants to access a steady stream of patients. (Id. ¶ 11, 70-83).

The defaulting Defendants partnered with the Law Offices of Gabriel & Moroff, P.C. ("Collection Lawyers") to represent Strobeck and the Strobeck PCs and arrange for or coordinate "Funding" (i.e., financing against receivables) of the fraudulent billing to be submitted to GEICO

in connection with the scheme, through companies that the attorney/law firm had relationships with, pursue payment and collection against GEICO, and accept insurance payments received through their attorney IOLA/Trust accounts, and then distribute the payments to the funding companies. (Am. Compl. ¶¶ 12-13). Defendants also arranged for the fraudulent claims to be funded through New Pacific ("New Pacific"). (Id. ¶ 13).

The fraudulent funding arrangements and money laundering aspect of the scheme, implemented by the Managing Defendants, in combination with HLC Consultants, allowed them to hide their identities, as well as their involvement and control over the Strobeck PCs, and to conceal the existence of illegal financial arrangements between the Defendants and other unlicensed individuals and entities who owned and managed the Clinics from where the Strobeck PCs rendered services to the Insureds. (Am. Compl. ¶¶ 70-83).

The defaulting Defendants acted in concert to effectuate a massive scheme, which resulted in the submission of than $2.4 million in fraudulent no-fault insurance charges to GEICO for the alleged performance of the Fraudulent Services at more than 25 separate clinic locations between July 26, 2021 and May 25, 2022. (Am. Compl. ¶¶ 4, 104-106). As a result of the Defaulting Defendants' actions, GEICO made $1,158,899.56 in voluntary payments to the Strobeck PCs in reliance on the fraudulent billing that the Defaulting Defendants submitted or caused to be submitted through the Strobeck PCs for Fraudulent Services. (See Asmus Decl., DE [95-8], ¶ 6; Abreu Decl., DE [95-3], ¶ 8).

GEICO brought this action on December 8, 2022. (See generally, DE [1], Compl.). GEICO later filed an Amended Complaint on November 6, 2023. (See generally Am. Compl.). The Complaint contains sixteen causes of actions against the Defendants. Including seeking a

declaratory judgment, for common-law fraud and unjust enrichment under New York law. (Am. Compl. ¶¶ 161-274).

The defaulting Defendants each failed to appear. All were properly served with the summons and Amended Complaint. (DE [45]-[48], [50], [52]-[54]).

The Clerk of Court entered defaults as to each of the defaulting Defendants on February 2, 2024, (Entries of Default), and GEICO filed its motion for default judgment on December 9, 2024. (Mot. for Default J.).[1]

In the instant motion, GEICO only seeks default and damages as to its Sixth, Eighth, Eleventh, Thirteenth, Fourteenth, and Sixteenth causes of action, all claims alleging common-law fraud and aiding and abetting fraud. GEICO seeks damages of $1,158,899.56 as well as pre-judgment interest at a rate of 9% per annum, not compounded, calculated starting from: (i) September 8, 2021 for checks issued to Integrated; (ii) October 22, 2021 for checks issued to HLAM; and (iii) April 29, 2022 for checks issued to JS Marble through and including November 18, 2024, which totals $311,451.50. For the reasons stated below, the Court respectfully recommends that the motion be granted against the defaulting Defendants in its entirety as to the common-law fraud and aiding and abetting claims.

DISCUSSION

I.    Legal Principles

A.    Standards Applicable to Damages Award Following Default Judgment

---

1. The Court notes that at the time the instant motion was filed, two additional defendants had appeared, and the parties were engaging in discovery as directed by this Court. (See DE [89], see also Scheduling Order dated 06/25/2024). However, subsequent to the filing of the instant motion, the two additional defendants have been voluntarily dismissed from the action. (DE [98]-[99]). Presently, the only remaining defendants are the defaulting Defendants.

Motions for default judgments are governed by Rule 55 of the Federal Rules of Civil Procedure, which provides for a two-step process. See Fed. R. Civ. P. 55; see also Priestley v. Headminder, Inc., 647 F.3d 497, 504-05 (2d Cir. 2011). First, the moving party must obtain a certificate of default from the Clerk of the Court. See Fed. R. Civ. P. 55(a). Once the certificate is issued, the moving party may apply for entry of a judgment of default. See Fed. R. Civ. P. 55(b).

In the context of a default, the well-pleaded allegations set forth in the complaint relating to liability are deemed true. See Greyhound Exhibitgroup, Inc. v. E.L. U.L. Realty Corp., 973 F.2d 155-58 (2d Cir. 1992). But a plaintiff is not entitled to a default judgment just because a party is in default. See City of New York v. Mickalia Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011). The court must determine whether the well-pled allegations establish liability as a matter of law. See id. In determining whether to grant a default judgment, the court looks to the same factors which apply to a motion to set aside a default judgment, namely: (1) whether the defendant's default was willful; (2) whether the defendant has a meritorious defense to the plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment. See Pecarsky v. Galaxiworld.com, Ltd., 249 F.3d 167, 170–71 (2d Cir. 2001); United States v. Myers, 236 F. Supp. 3d 702, 706 (E.D.N.Y. 2017).

If liability is established, the court turns to ascertain damages "with reasonable certainty." Credit Lyonnais Sec., Inc. v. Alcanture, 183 F.3d 151, 155 (2d Cir. 1999). A hearing is not required and affidavits may be sufficient as long as the Court can ensure that there is a basis for the damages sought by way of the proposed default judgment. See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997).

II.     Disposition of the Motion

    A.     Default

    1.     Defendants' Default Was Willful

The Court first considers whether the default was willful. A default is considered willful where the defendant fails to answer a complaint without explanation or justification. See S.E.C. v. McNulty, 137 F.3d 732, 738–39 (2d Cir. 1998); Myers, 236 F. Supp. 3d at 707; see also Indymac Bank v. Nat'l Settlement Agency, Inc., No. 07-CV-6865, 2007 WL 4468652, at *1 (S.D.N.Y. Dec. 20, 2007) (finding that failure to respond to both the complaint and a motion for default judgment demonstrates willful conduct).

The defaulting Defendants' failure to respond to the Complaint demonstrates their default was willful. See, Indymac Bank, 2007 WL 4468652 at *1 (finding that the defendants' non-appearance and failure to respond "indicate willful conduct" and granting plaintiff default judgment against them). All were properly served with the summons and Amended Complaint, and therefore had sufficient notice of the present litigation.  The motion for default judgment was also served via mail to the Defendants in accordance with Local Civil Rule 55.2, i.e., at their last known business addresses and/or home addresses. (See DE [94], Aff. of Service by Mail). Notwithstanding this notice and service, the defaulting Defendants did not respond to the Complaint, did not appear, and have not in any way attempted to defend themselves, thus willfully defaulting. See, e.g., Sola Franchise Corp. v. Solo Salon Studios Inc., No. 14-CV-946, 2015 WL 1299259, at *6 (E.D.N.Y. Mar. 23, 2015) (adopting report and recommendation) ("Defendant has not responded to Plaintiffs' motion for default judgment, has not appeared in this action, and has not communicated with the Court in any way. Accordingly, Defendant's

failure to answer the Complaint and to respond to the instant motion is sufficient to establish willfulness.").

        2.    <u>Meritorious Defenses</u>

The Court is not aware of any meritorious defenses the defaulting Defendants could present in this matter. In addition, denying the motion for default judgment would be prejudicial to Plaintiff, "as there are no additional steps available to secure relief in this Court." <u>Myers</u>, 236 F. Supp. 3d at 708–09 (quoting <u>Bridge Oil Ltd. v. Emerald Reefer Lines, LLC</u>, No. 06-CV-14226, 2008 WL 5560868, at *2 (S.D.N.Y. Oct. 27, 2008)).

As a result, the factors weigh in favor of the entry of default judgment.

        B.    <u>Liability For Common-Law Fraud</u>

GEICO alleges that it is entitled to default judgment on its common-law fraud claims. In deciding a motion for default judgment, a court "is required to accept all of the [plaintiff]'s factual allegations as true and draw all reasonable inferences in its favor." <u>Finkel v. Romanowicz</u>, 577 F.3d 79, 84 (2d Cir. 2009). A party's default is deemed an admission of all well-pleaded allegations of liability. <u>See</u> <u>Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.</u>, 973 F.2d 155, 158 (2d Cir. 1992); <u>Morales v. B & M Gen. Renovation Inc.</u>, No. 14-CV-7290, 2016 WL 1266624, at *2 (E.D.N.Y. Mar. 9, 2016), <u>report and recommendation adopted</u>, 2016 WL 1258482, at *2 (Mar. 29, 2016). "Nevertheless, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." <u>LaBarbera v. ASTC Laby's Inc.</u>, 752 F. Supp. 2d 263, 270 (E.D.N.Y. 2010) (citation and quotations omitted); <u>see also</u> 10A Charles Alan Wright & Arthur R. Miller et al., <u>Federal Practice and Procedure</u> § 2688.1 (3d ed. 2017). The Court must therefore determine whether the facts alleged in the Complaint are sufficient to establish liability of the Defendants.

"Under New York law, a plaintiff asserting a claim of common law fraud must plausibly allege: '(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff.'" Gov't Emps. Ins. Co. v. ALP Supply, Inc., No. 22-CV-79, 2023 WL 5846680, at *5 (E.D.N.Y. Sept. 11, 2023) (quoting Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006)), report and recommendation adopted, Order (Sept. 28, 2023). "Additionally, in federal court, '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" Id. (alteration in original) (quoting Fed. R. Civ. P. 9(b)). Therefore, a plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC, 797 F.3d 160, 171 (2d Cir. 2015) (quotations omitted).

    1.    <u>Material Misrepresentation or Omission of Fact and Rule 9(b)</u>

GEICO has described in detail how the defaulting Defendants ran a scheme pursuant to which they submitted charges for reimbursements for which they were not eligible. GEICO alleges that the defaulting Defendants submitted or caused the submission of thousands of NF-3 forms using the names and tax identification numbers of the defaulting \Defendants, which represented that the services were provided by Strobeck, which they were not. GEICO further alleges that the Defaulting Defendants concealed that Strobeck PCs were under the control of the Management Defendants, and that the services were performed by unlicensed laypersons. These forms also omitted that the services were provided pursuant to illegal kickback and referral arrangements.

GEICO attached charts listing the bills that the defaulting Defendants caused to be submitted to GEICO, along with claim numbers and when the claim was received, as an exhibit. (Representative Sample Fraudulent Claims Identified ("Claims Chart"), attached as Ex. 2 to Am. Compl. DE [43-2]. GEICO also attached exhibits identifying payments made by GEICO to the Strobeck PCs according to their tax identification numbers ("TIN Runs') and sets forth the total amounts that GEICO voluntarily paid in reliance on the fraudulent bills submitted to GEICO. See Tax Identification Payment Runs ("TIN Runs"), attached as Exs. A–C to Decl. of Kathleen Asmus ("Asmus Decl."), attached as Ex. 5 to Mot. for Default J., DE [95-8]). The spreadsheets for the Strobeck PCs include the date and dollar amount claimed for each bill. (TIN Runs).

The Amended Complaint alleges that each and every one of these bills was submitted by the defaulting Defendants through the Strobeck PCs, each sought reimbursement prohibited under the no-fault law, and each contained one or more false statements. The Claims Charts— which identify claims (and thereby the fraudulent statements) made by each of the Strobeck PCs and when those claims were made—are sufficient to meet the standard of Rule 9(b). See, e.g., Gov't Emps. Ins. Co. v. Badia, No. 13-CV-1720, 2015 WL 1258218, at *15 (E.D.N.Y. Mar. 18, 2015) ("Plaintiffs' very detailed chart identifies Baneur as the speaker of the fraudulent statements and states when and where each statement was made by listing Baneur's claim submission dates, claim numbers and claim-demand amounts."); Gov't Emps. Ins. Co. v. Alrof, Inc., No. 11-CV-4028, 2013 WL 9600668, at *5 (E.D.N.Y. July 19, 2013) ("Plaintiffs set forth examples and described in detail how the Retail Defendants submitted charges for items more expensive than those actually dispensed, if dispensed at all. Plaintiffs have also supplied a schedule detailing when the Retail Defendants' claims were paid. Accordingly, Plaintiffs have pled the fraud with sufficient particularity[.]" (citations omitted)), report and recommendation

adopted sub nom. Gov't Emps. Ins. Co. v. Park Slope Med. & Surgical Supply, Inc., 2013 WL

5209415, at *1, *6 (Sept. 13, 2013); Allstate Ins. Co. v. Lyons (Lyons I), 843 F. Supp. 2d 358,

373 (E.D.N.Y. 2012) ("Allstate attaches to its Complaint a series of charts that include each of

the charges submitted by the defendants that it believes were fraudulent. The charts detail the

entity that submitted each claim, as well as the corresponding claim number, the year Allstate

paid the claim, and the amount paid by Allstate. Such information clearly directs defendants to

the specific misrepresentations Allstate is alleging. Under the circumstances, the specificity

requirement of 9(b) requires no more[.]" (citation omitted)).

   2.  Knowledge and Intent to Defraud

   Though, under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's

mind may be alleged generally," Fed. R. Civ. P. 9(b), a plaintiff must still "allege facts 'that give

rise to a strong inference of fraudulent intent.'" Loreley Fin., 797 F.3d at 171 (quoting Lerner v.

Fleet Bank, N.A., 459 F.3d 273, 290–91 (2d. Cir. 2006)). This strong inference of fraud "may be

established either (a) by alleging facts to show that defendants had both motive and opportunity

to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of

conscious misbehavior or recklessness." Lerner, 459 F.3d at 290–91 (quoting Shields v. Citytrust

Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

   GEICO alleges that the defaulting Defendants knew that the claims they submitted to

GEICO were fraudulent and that doing so was part of an intentional scheme to defraud it. (Am.

Compl. ¶ 55 ("[T]he Defendants orchestrated and implemented a complex fraudulent scheme in

which the Strobeck PCs were used to illegally bill GEICO … millions of dollars for medically

unnecessary, excessive, experimental, and otherwise non-reimbursable services (i.e., the

Fraudulent Services)."); id. ¶ 71 ("As part of the fraudulent scheme, the Management Defendants

arranged to have the account receivables associated with the billings for the Fraudulent Services 'funded' through New Pacific with the assistance of the Collection Lawyers and arranged for documents to be signed directing the payments to be made to them and other third parties rather than Strobeck. In addition, the Management Defendants had the Collection Lawyers handle the billing to GEICO and other New York automobile insurers for the Fraudulent Services, and to act as an escrow agent for purposes of clearing the funds that GEICO paid as a result of the fraudulent claims through their IOLA/Attorney Trust Account.); id. ¶ 101 ("In furtherance of the scheme, the Management Defendants recruited and hired unlicensed technicians to (i) provide the Fraudulent Services on behalf of the Strobeck PCs to Insured at the Clinics and (ii) generate the necessary paperwork from the unlawful referrals.").

Further, GEICO alleges that the Defendants were motivated to "induce GEICO to promptly pay the fraudulent for the Fraudulent Services, Defendants systemically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme and went to great lengths to accomplish this concealment charges ... that were not compensable under New York no-fault insurance laws," (Am. Compl. ¶ 156) and had the opportunity to receive reimbursements from GEICO by submitting fraudulent claims (See id. ¶ 153 ("To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted to GEICO thousands of NF-3 forms, AOBs and medical reports/records … seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment."). The defaulting Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.")).

These allegations are sufficient to establish the *mens rea* elements of common-law fraud. See Gov't Emps. Ins. Co. v. Elmwood Park Med. Grp., P.C., No. 21-CV-617, 2022 WL 772737, at *8 (E.D.N.Y. Feb. 23, 2022) (finding GEICO's allegations that Defaulting Defendants knew that the claims they submitted were fraudulent, that the submissions were made as part of an intentional scheme to defraud, and that they had motive and opportunity to receive payments they were not entitled to by submitting fraudulent claims sufficient to establish the second and third elements of common-law fraud), report and recommendation adopted, 2022 WL 768360, at *1 (Mar. 14, 2022); see also Gov't Emps. Ins. Co. v. Li-Elle Serv., Inc., No. 12-CV-2157, 2013 WL 829302, at *7 (E.D.N.Y. Feb. 11, 2013) ("Plaintiffs allege that Defendants not only knew that they were submitting fraudulent claims to GEICO, but that they did so intentionally in a scheme for profit. This gives rise to a strong inference of fraudulent intent and is sufficient to establish the scienter requirement." (citation omitted)), report and recommendation adopted as modified, 2013 WL 829274, at *1 (Mar. 6, 2013).

3.    Reasonable Reliance and Damage

A plaintiff's reliance on intentionally fraudulent statements is reasonable without further investigation when 'matters are held to be peculiarly within defendant's knowledge ... as [plaintiff] has no independent means of ascertaining the truth.'" Allstate Ins. Co. v. Smirnov, No. 12-CV-1246, 2013 WL 5407224, at *7 (E.D.N.Y. Aug. 21, 2013) (quoting Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1542 (2d Cir. 1997)), report and recommendation adopted, Mem. and Order (Sept. 25, 2013). And in insurance fraud cases, "[i]nsurance companies are permitted to rely on 'facially valid' insurance reimbursement claims." Gov't Emps. Ins. Co. v. Erlikh, No. 16-CV-7120, 2019 WL 1487576, at *7 (E.D.N.Y. Feb. 28, 2019), report and recommendation adopted, Order (Mar. 31, 2019). The Complaint explains GEICO's

statutory and contractual duty to "promptly and fairly process claims within 30 days" and alleges the fraudulent claims submitted by the Defendants were "facially valid ... and ... cause[d] GEICO to rely upon them." (Am. Compl. ¶ 159). Based on these facially valid documents, GEICO alleges it paid the defaulting Defendants $ 1,158,899.56. (Asmus Decl. ¶ 6) in fraudulent charges. These allegations, taken as true on default, satisfy the fourth and fifth elements of common-law fraud by showing a reasonable reliance on the defaulting Defendants' misrepresentations, which caused injury to GEICO. See, e.g., Erlikh, 2019 WL 1487576, at *7 ("Given the lengths the Defaulting Defendants took to conceal the fraudulent bills, the existence of the 30-day requirement, and the facially valid bills, it was reasonable for GEICO to rely on the bills containing the purported misstatements and pay the Defaulting Defendants." (internal citation omitted)); see also Elmwood Park Med. Grp., P.C., 2022 WL 772737, at *8 (finding Plaintiff sufficiently alleged the fourth and fifth elements of common-law fraud where Plaintiff alleged that Defaulting Defendants falsely represented their eligibility to receive reimbursements in its submissions and that Plaintiff relied on the facially valid submissions to pay the Defaulting Defendants).

GEICO, therefore, has sufficiently alleged each of the elements for a claim of common-law fraud against the defaulting Defendants and is therefore entitled to a judgment of liability on this claim. See Allstate Ins. Co. v. Abramov, No. 16-CV-1465, 2020 WL 1172697, at *11 (E.D.N.Y. Feb. 21, 2020), report and recommendation adopted, 2020 WL 1166498, at *1 (Mar. 11, 2020).

C.    Aiding and Abetting Common Law Fraud

GEICO also seeks a default judgment for against HLC Consultants on its cause of action for aiding and abetting fraud.

Under New York law, a plaintiff asserting a claim of aiding and abetting fraud must show "(1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Krys v. Pigott, 749 F.3d 117, 127 (2d Cir. 2014) (internal quotation marks, alteration and citation omitted). "Accordingly, evidence that a defendant could or should have been able to deduce the fact of an underlying fraud on the basis of red flags or warning signs is not a substitute for actual knowledge." See Nathel v. Siegal, 592 F.Supp.2d 452, 468–69 (S.D.N.Y. 2008). But while constructive knowledge alone cannot support a claim for aiding and abetting fraud, circumstantial evidence can be sufficient to support a finding of actual knowledge. See id. at 468 ("[A]llegations of constructive knowledge or recklessness are insufficient ... [but an] allegation of actual knowledge does not have to be based on defendant's explicit acknowledgment of the fraud.").

Substantial assistance constitutes "a substantial contribution to the perpetration of the fraud." JPMorgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005). It exists "where a defendant 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed.'" Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) (quoting Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., No. 98 Civ. 4960, 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999)).

Also embedded into the substantial assistance element is a proximate cause analysis, which requires a showing that "a defendant's participation [was] the proximate cause of plaintiff's injury." Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158, 167 (S.D.N.Y. 2003). An aider and abettor's substantial assistance to a fraud can be considered a proximate cause where a plaintiff's injury was "a direct or reasonably foreseeable result of the defendant's

conduct." <u>Filler v. Hanvit Bank</u>, Nos. 01 Civ. 9510, 02 Civ. 8251, 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003).

GEICO alleges that HLC Consultants made knowing and material misrepresentations by creating the appearance that it provided legitimate goods and/or services to the Strobeck PCS when it fully knew that none of the payments issued to HLC Consultants were for legitimate goods and/or services. HLC Consultants knowingly laundered the advances from New Pacific against account receivables for the Strobeck PCs'. More than $350,000.00 was paid to the Management Defendants through HLC Consultants bank account. Without the advances, the Management Defendants would not have been able to profit from their participation in the fraud scheme while also concealing their identities and involvement in the scheme. Since the laundering of the advances was a critical aspect of the scheme, and the Strobeck PCs submission of bills in connection with the funding advances were reasonably foreseeable, GEICO has sufficiently demonstrated that HLC Consultants proximately caused the harm sustained by GEICO. Because Plaintiffs have described the active participation of HLC Consultants in the defaulting Defendants' fraud, they have alleged with sufficient particularity that the HLC Consultants knowingly and substantially assisted the underlying fraud.

Accordingly, it is respectfully recommended that Judgment be entered against HLC Consultants for aiding and abetting fraud.

D.      <u>Joint and Several Liability</u>

GEICO seeks to hold the Defendants jointly and severally liable. "Under New York law, where defendants acted jointly and/or concurrently to produce a single injury, those defendants must be held jointly and severally liable for all of the harm resulting from their actions." <u>Gov't Emps. Ins. Co. v. Infinity Health Prods., Ltd.</u>, No. 10-CV-5611, 2012 WL 1427796, at *10

(E.D.N.Y. Apr. 6, 2012), <u>report and recommendation adopted</u>, 2012 WL 1432213, at *1 (Apr. 25, 2012). "Joint and several liability may ... be imposed where a plaintiff demonstrates that the harm it suffered as a result of the conduct of two or more defendants is 'indivisible.'" <u>Gov't Emps. Ins. Co. v. Spectrum Neurology Grp., LLC</u>, No. 14-CV-5277, 2016 WL 11395017, at *6 (E.D.N.Y. Feb. 17, 2016) (citing <u>Infinity Health Prods.</u>, 2012 WL 1427796, at *11), <u>report and recommendation adopted</u>, 2016 WL 1071099, at *1 (Mar. 18, 2016); <u>see also</u> <u>Erlikh</u>, 2019 WL 1487576, at *8.

The scheme perpetrated by the defaulting Defendants collectively caused the thousands of bills that are subject to this action to be submitted. (Compl. ¶ 153 ("Defendants systematically submitted or caused to be submitted to GEICO thousands of NF-3 forms, AOBs and medical reports/records … seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment..")).

Because responsibility for the documents containing the fraudulent statements—each bill submitted to GEICO—cannot be allocated between the defaulting Defendants, the harm GEICO suffered from each bill is indivisible. Where courts have found that an injury is divisible, there has been a clear allocation of fault between each defaulting defendant. <u>See</u>, <u>e.g.</u>, <u>Gov't Emps. Ins. Co. v. Parkway Med. Care, P.C.</u>, No. 15-CV-3670, 2017 WL 1133282, at *15 (E.D.N.Y. Feb. 21, 2017) ("Plaintiffs have not established that the injury they sustained by reimbursing each corporate Defaulting Defendant was indivisible. To the contrary, ... Plaintiffs' submissions identify claims submitted by each Defaulting Defendant, indicate which defendant is responsible for each claim, and list the amounts paid to each Defendant."), <u>report and recommendation adopted</u>, 2017 WL 1131901, at *1 (Mar. 24, 2017). That situation is not present here, and it is therefore appropriate to impose joint and several liability on the Strobeck PCs Defendants, HLC

Consultants, and the Management Defendants. See, e.g., Allstate Ins. Co. v. Williams (Williams I), No. 13-CV-2893, 2014 WL 6900121, at *10 (E.D.N.Y. Dec. 5, 2014) ("The Individual Defendants and PC Defendants participated in and caused the submission of fraudulent bills to Allstate, and attempted to conceal the fraud, thus all contributing to a single indivisible injury to Allstate. Therefore, the Individual Defendants and their respective medical professional corporations should be held jointly and severally liable for the state law claims.") adopting report and recommendation; Gov't Emps. Ins. Co. v. IAV Med. Supply, Inc., No. 11-CV-4261, 2013 WL 764735, at *9 (E.D.N.Y. Feb. 8, 2013) (finding defendants in each discrete scheme were jointly and severally liable), report and recommendation adopted, 2013 WL 765190, at *1 (Feb. 28, 2013); Travelers Indem. Co. v. Liberty Med. Imaging Assocs., P.C., No. 07-CV-2519, 2009 WL 962789, at *5 (E.D.N.Y. Mar. 15, 2009) (same), report and recommendation adopted in relevant part, 2009 WL 962788, at *2 (Apr. 8, 2009).

  E.  Damages

  1.  Fraud Damages

  "While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." Greyhound Exhibitgroup, 973 F.2d at 158. "Although the default establishes a defendant's liability, unless the amount of damages is certain, the court is required to make an independent determination of the sum to be awarded." Griffiths v. Francillon, No. 10-CV-3101, 2012 WL 1341077, at *1 (E.D.N.Y. Jan. 30, 2012) (quotations and citations omitted), report and recommendation adopted, 2012 WL 1354481, at *2 (Apr. 13, 2012). "The court must conduct an inquiry to ascertain the amount of damages with reasonable certainty." Joe Hand Promotions, Inc. v. El Norteno Rest. Corp., No. 06-CV-1878, 2007 WL 2891016, at *2 (E.D.N.Y. Sept. 28, 2007) (citing Transatlantic Marine

Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1992)). "Where, on a damages inquest, a plaintiff fails to demonstrate its damages to a reasonable certainty, the court should decline to award any damages even though liability has been established through default." Lenard v. Design Studio, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012) (adopting report and recommendation) (collecting cases). Under Rule 55(b)(2), "it [is] not necessary for the District Court to hold a hearing" to determine the amount of damages, "as long as it ensured that there was a basis for the damages specified in the default judgment." Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989); see Sec'y of U.S. Dep't of Hous. & Urb. Dev. v. Gilbert, No. 20-CV-1441, 2022 WL 344270, at *3 (N.D.N.Y. Feb. 4, 2022) ("A hearing is not necessary where the record contains detailed affidavits and documentary evidence that enables the court to evaluate the proposed sum and determine an award of damages." (citing Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 54 (2d Cir. 1993))).

GEICO has submitted declarations from Jennifer Abreu, counsel for GEICO; Kathleen Asmus, an employee of GEICO; and other supporting documents to demonstrate its precise damages. (Abreu Decl.; Asmus Decl.; Claims Chart; TIN Runs). The Defendants have not submitted any response or opposition to these filings.

GEICO seeks damages in an amount equal to the payments it has made to the Defendants. (Abreu Decl. ¶ 13). GEICO's fraud claim is premised on the allegation—accepted as true on default—that each bill submitted contained a misstatement or omission. (See Am. Compl. ¶¶ 158, 200-202). And as a result, the entirety of the amount sought from and paid by GEICO was reimbursement prohibited under the no-fault law. (See id. ¶¶ 1, 154, 199-203, 235, 245-250). Under such a fraud theory, where each bill constitutes a fraudulent claim, GEICO is entitled to damages in the entire amount it paid to the Defendants. See Restatement (Second) of Torts § 525

(Am. L. Inst. 1977) ("One who fraudulently makes a misrepresentation of fact ... for the purpose of inducing another to act ... is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."); see, e.g., Allstate Ins. Co. v. Williams (Williams II), No. 13-CV-2893, 2015 WL 5560543, at *7 (E.D.N.Y. Aug. 28, 2015) (describing how each bill listed in Allstate's spreadsheets reflects "payment for each allegedly fraudulent claim"), report and recommendation adopted sub nom. Allstate Ins. Co. v. Dublin, 2015 WL 5560546, at *1 (Sept. 21, 2015); Chubb & Son Inc. v. Kelleher, No. 92-CV-4484, 2010 WL 5978913, at *6–*7 (E.D.N.Y. Oct. 22, 2010) (recommending an award of damages for the entirety of claims submitted for reimbursement under RICO and common-law fraud), report and recommendation adopted, 2011 WL 839553, at *1 (Mar. 7, 2011).

GEICO has submitted records—in the form of spreadsheets—of the payments made to the Strobeck PCs "in connection with the claims that were submitted or caused to be submitted by the Defaulting Defendants." (Asmus Decl. ¶ 6; see also TIN Run; Claims Chart). These records were generated using "GEICO's earnings reporting system," which also generates IRS Forms 1099-MISC, and which allow GEICO to track payments made to each payee using its tax identification number. (Asmus Decl. ¶ 5). GEICO's method of compilation is a reliable means to determine damages. See, e.g., Gov't Emps. Ins. Co. v. Armengol, No. 20-CV-6052, 2022 WL 432320, at *9 (E.D.N.Y. Jan. 19, 2022) (finding the same method reliable), report and recommendation adopted, 2022 WL 426163, at *1 (Feb. 11, 2022); see also Erlikh, 2019 WL 1487576, at *9 (same).

Therefore, the Court respectfully recommends that GEICO be awarded a judgment against the defaulting Defendants for $1,158,899.56.

2.    Pre-Judgment Interest

GEICO seeks pre-judgment interest at a rate of 9% per year on its fraud damages. (Abreu Decl. ¶ 14). "In diversity cases, the award of prejudgment interest is a substantive issue, governed ... by New York law." IAV Med. Supply, Inc., 2013 WL 764735, at *8. New York law provides for pre-judgment interest on fraud claims, id., and dictates that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed," N.Y. C.P.L.R. § 5001(b). In the insurance fraud context, however, "prejudgment interest accrues from the date the insurance company makes payment." IAV Med. Supply, Inc., 2013 WL 764735, at *9 (quotations omitted).

In its motion, GEICO requests less interest than what New York law provides; it requests that the Court calculate interest "from the first day following the quarter in which the payments were made by GEICO to the Defaulting Defendants[.]" (Mem. of Law at 31). The Court recommends that GEICO be awarded pre-judgment interest at 9% per year, beginning on the first day of the quarter following GEICO's payments through the date of the entry of judgment. The pre-judgment interest calculated from the date of payment to the Strobeck PCs at the rate of 9% per annum pursuant to C.P.L.R. §§ 5001 and 5004, equates to a daily interest rate of 0.02466%. (Abreu Decl. ¶ 15).

The charts provided by GEICO calculate the pre-judgment interest for each voluntary payment based upon the total number of days between when each payment was issued and November 18, 2024. (Abreu Decl. ¶ 16). For each claim, interest was calculated by multiplying (i) the daily interest rate; (ii) the voluntary payment amount; and (iii) the number of days up to November 18, 2024. (Id.); see also Exs. 6-8, Abreu Decl., DE [9], [10], [11]. Checks issued (i) to Integrated are compounded from September 8, 2021; (ii) to HLAM are compounded from October 22, 2021; and (iii) to JS Marble are compounded from April 29, 2022. (See Exs. 6-8,

Abreu Decl). Plaintiffs have provided such calculations through November 18, 2024 – totaling $311,451.50. Accordingly, Plaintiffs are entitled to $311, 451.50 in pre-judgment interest through November 18, 2024.

Plaintiffs are also entitled to per diem interest from November 19, 2024, to the final entry of judgment, should this Report and Recommendation be adopted. Calculation of the per diem interest rate shall be consistent with the methodology used to determine the pre-judgment interest through November 18, 2024.

3. Post Judgment Interest

Plaintiffs are entitled to post judgment interest from defaulting Defendants. Pursuant to 28 U.S.C. § 1961, post judgment interest is calculated from the date of entry of judgment at a rate equal to the weekly average one-year constant maturity Treasury yield, to be computed by the Clerk of the Court.

CONCLUSION

For these reasons the Court respectfully recommends that Plaintiffs' motion for a default judgment be granted against the defaulting Defendants. Further, this Court respectfully recommends that the defaulting Defendants be held jointly and severally liable for damages in the amount of $1,158,899.56 and pre-judgment interest in the amount of $311,451.50 through November 18, 2024, for a total amount of $1,470.351.06. This Court also respectfully recommends that the defaulting Defendants be jointly and severally liable for pre-judgment interest from November 19, 2024, to the final entry of judgment, should this Report and Recommendation be adopted. Calculation of the per diem interest rate shall be consistent with the methodology used to determine the pre-judgment interest through November 18, 2024. Finally, this Court respectfully recommends that Plaintiffs be awarded post judgment interest

calculated from the date of entry of judgment at a rate equal to the weekly average one-year constant maturity Treasury yield, to be computed by the Clerk of the Court.

<u>OBJECTIONS</u>

A copy of this Report and Recommendation is being provided to Plaintiffs' counsel via ECF.  Furthermore, the Court directs Plaintiffs' counsel to (1) serve a copy of this Report and Recommendation by first class mail to Defendants at their last known addresses, and (2) file proof of service on ECF by August 11, 2025. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this report.  28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. <u>Thomas v. Arn</u>, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); <u>Caidor v. Onondaga Cnty</u>., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.").

Central Islip, New York
August 6, 2025

 /s/ Anne Y. Shields
Anne Y. Shields
United States Magistrate Judge